**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-mj-276** |
| **SCOTT MILLER,** | **Magistrate Judge Moxila A. Upadhyaya** |
| **Defendant.** | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

On January 6, 2021, defendant SCOTT MILLER, a leading member of the Maryland/District of Columbia chapter of the Proud Boys organization, struck, hit and jabbed police officers with poles, threw various items at officers, and ripped a police riot shield out of the hands of police who were defending an entrance to the U.S. Capitol building. As a result of his actions on January 6, MILLER has been charged with numerous crimes, including assault, disorderly conduct, and theft of government property. On the day of his arrest, agents executed a search warrant on MILLER's home and located four guns, hundreds of rounds of ammunition, a tactical vest, and a detailed blueprint for the assembly of assault rifles. As U.S. Pretrial Services opines, MILLER is a danger to the community and should be detained pending trial.

**BACKGROUND**

**A.  Statement of Facts**

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification were allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public.

1

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice

President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

According to closed circuit television ("CCTV"), body-worn camera footage from Metropolitan Police Department ("MPD") officers, and public source video from the U.S. Capitol on January 6, 2021, a man later identified as SCOTT MILLER ("MILLER") assaulted multiple police officers and stole a U.S. Capitol Police riot shield while outside an entrance to the U.S. Capitol on the Lower West Terrace, referred to as "the tunnel."

1. **BOLO #132's Assaults on Officers and Theft of Government Property on January 6, 2021**

According to video footage taken at the U.S. Capitol on January 6, 2021, at approximately 4:16 p.m., a man who was wearing orange ski goggles, a black hooded sweatshirt, a tan coat, a tan backpack, a black and red neck gaiter, dark-colored pants, and black gloves appeared near the tunnel where rioters were actively pushing against the police line in an effort to breach the U.S. Capitol building. The FBI subsequently posted images of this individual under BOLO #132 to its website and asked the public's assistance in identifying him.  Below is a still image from CCTV footage depicting BOLO #132 at the tunnel:



At approximately 4:27 p.m., BOLO #132, who was still located on the north side of the tunnel, assaulted a Metropolitan Police Officer ("Victim 1") by striking her/him multiple times with the end of a pole. Below is a still image from Victim 1's body-worn camera footage depicting BOLO #132 swinging a pole at Victim 1:



On or about November 22, 2022, law enforcement interviewed Victim 1. During the interview, Victim 1 was shown the above body-worn camera footage and still image. Victim 1 told law enforcement that s/he remembered the individual depicted above (BOLO #132) and that he hit her/him with the pole that he was swinging. S/he stated s/he believed BOLO #132 hit her/him on the helmet.

According to CCTV footage, at approximately 4:31 p.m., BOLO #132 was located at the south side of the tunnel where he began to throw objects into the tunnel at MPD officers. Below is a still image taken from a public video ("Public Video 1")[1] depicting BOLO #132 throwing what appears to be a pipe or a pole into the tunnel at officers:



---

[1] Public Video 1 is available at https://www.youtube.com/watch?v=zcRFEYnHWyM. Public Video 1 does not have timestamps, however, the government has estimated the approximate time of the events depicted in Public Video 1 by comparing it with CCTV and body worn camera footage depicting the same events.

Below is another still image from Public Video 1 depicting BOLO #132 throwing what appears to be a bottle into the tunnel and at officers:



Below is another still image from Public Video 1 depicting BOLO #132 throwing another wooden object into the tunnel and at officers:



Below is another still image from Public Video 1 depicting BOLO #132 throwing a large black box, potentially a speaker, into the tunnel and at officers:



Below is another still image from Public Video 1 depicting BOLO #132 throwing an item of clothing into the tunnel and at officers:



After throwing these items into the tunnel, at approximately 4:33 p.m., BOLO #132 then assaulted a number of officers by striking them with a large blue and white pole. Below are still images from CCTV and Public Video 1, respectively, depicting BOLO #132's assaults:





After swinging the pole and striking multiple officers, BOLO #132 swung the pole again multiple times approximately five seconds later and struck more MPD officers. Below are still images from CCTV depicting BOLO #132 striking MPD officers with the blue and white pole:





After striking officers with the blue and white pole, BOLO #132 then grabbed ahold of a U.S. Capitol Police riot shield being held by two officers ("Officer 1" and "Officer 2") and after a brief struggle, forcibly pulled the U.S. Capitol Police riot shield out of the officers' grip. In the below BWC still image, BOLO #132's black gloves can be seen gripping the upper left side of the shield and the sleeve of his brown jacket is visible:



Approximately one second later, BOLO #132's torso and head (wearing the orange goggles) can be seen gripping the shield and pulling it away from the officers:



Below is a still image from CCTV captured approximately two seconds later depicting BOLO #132 pulling the riot shield away from officers:



According to CCTV footage, BOLO #132 then took the shield and handed it to someone in the crowd before disappearing into the crowd. Below is a still image from Public Video 1 depicting BOLO #132 holding the U.S. Capitol Police riot shield in the crowd:



On or about November 22, 2022, law enforcement interviewed Officer 1 and Officer 2 separately. During Officer 1's interview, Officer 1 was shown body-worn camera footage and CCTV footage depicting BOLO #132 taking the riot shield. Officer 1 confirmed that s/he was one of the officers holding the riot shield. Officer 1 also stated that s/he recognized BOLO #132 as the individual who took the shield from her/him and another officer. Similarly, Officer 2 was also shown body-worn camera footage and CCTV footage depicting BOLO #132 taking the riot shield. Officer 2 stated that s/he recognized the gloves of BOLO #132 as the gloves of one of the individuals who took the shield from her/him.

Another public video ("Public Video 2")[2] depicts BOLO #132, who was still located near the tunnel, removing his goggles. Below are zoomed still images from Public Video 2:





Additionally, law enforcement obtained photographs from a confidential human source ("CHS")[3] that were taken by an anonymous photographer on the grounds of the U.S. Capitol on January 6, 2021. Specifically, below is a photograph provided by the CHS at the entrance to the tunnel on the Lower West Terrace at approximately 4:34 p.m. which depicts BOLO #132 without his goggles on:



---

[3]CHS is an established source who is on a team of open-source researchers who began collaborating shortly after January 6th, 2021, to identify Capitol rioters. CHS' group is motivated by a desire to assist law enforcement regarding the events of January 6, 2021, at the U.S. Capitol. CHS has provided multiple pieces of corroborated information. CHS does not have personal knowledge of the subjects of reporting but rather derives information solely through open-source research.

Below is an image of BOLO #132 from the above photograph that is zoomed in:



### 2.   Identification of BOLO #132 as SCOTT MILLER

Through investigative analysis, law enforcement made a preliminary determination that BOLO #132 was a possible match with a photograph of an individual named SCOTT MILLER on a website for a business in West Virginia ("Company A").

In or around March 2022, law enforcement obtained wage records for MILLER from Company A. These records indicated that MILLER worked for Company A on January 6, 2021.

During the investigation, law enforcement served legal process on Company A. On or about April 4, 2022, an employee of Company A ("Employee 1") sent law enforcement an email with a screenshot of a text message exchange dated January 5, 2021. Employee 1 informed agents via email that the text message was between MILLER and another employee ("Employee 2"). The text message was with phone number XXX-XXX-8070. In the text message, MILLER informed Employee 2 that he would not be at work the following day (January 6) because he needed to buy a new truck.

On or about April 26, 2022, law enforcement spoke with an individual who worked at Company A ("Employee 2"). During the interview, Employee 2 viewed multiple photographs of MILLER, including photographs from January 6, 2021. When shown the below photograph, Employee 2 stated that the individual looked like MILLER but also looked like another individual s/he knew. S/he stated that the man in the photograph looked more like MILLER than the other individual s/he knows. [4]



Employee 2 positively identified the man in the below two photographs as MILLER. Employee 2 stated, "Never seen him so red in the face before but looks like Miller."

[4] The FBI received tips from other members of the public regarding the photographs of FBI BOLO #132. A number of these tips identified the photographs as depicting an individual other than MILLER.





Employee 2 also identified XXX-XXX-8070 as MILLER's phone number.

On or about April 27, 2022, law enforcement interviewed another employee from Company A ("Employee 3"). During the interview, law enforcement showed Employee 3, the below photograph and Employee 3 stated that the photograph looked familiar, like MILLER.



Employee 3 was shown other photographs of MILLER, including photographs from January 6, 2021, and Employee 3 identified each photograph as depicting MILLER and stated that s/he recognized the jacket MILLER was wearing on January 6, 2021.

### B.  Arrest of MILLER and Search of His Residence

MILLER was arrested pursuant to a criminal complaint on December 16, 2022. On the same date, law enforcement executed a search warrant on the residence where MILLER was living. During the search, and among other things, law enforcement located a tan jacket matching the appearance of the jacket worn by MILLER on January 6, 2021. Law enforcement also located a pair of black gloves with plastic knuckles that closely resembles the gloves worn by MILLER on January 6 and described by Officer 2 as being worn by the rioter who took the shield from Officer 2.

During the search of the residence, law enforcement also located four guns: a handgun, a loaded shotgun, a rifle and a disassembled assault rifle ("AR"). The loaded shotgun was located in

MILLER's bedroom, next to his nightstand. A black semiautomatic pistol was also located in a gun case next to a nightstand in MILLER's bedroom. A Ruger rifle was also located in MILLER's home, in a rifle case under his bed:

Law enforcement also located disassembled assault rifle parts in MILLER's basement. As pictured below, the AR was located on a worktable on top of a mat that included a blueprint for assembling assault rifles.

*Disassembled Assault Rifle*



Law enforcement also recovered hundreds of rounds of ammunition in the residence, including: (1) a loaded magazine with six .45 caliber bullets from a dresser drawer in MILLER's bedroom; (2) loose ammunition from the pocket of a coat in a closet; (3) shotgun ammunition next to MILLER's bed; (4) additional miscellaneous ammunition under MILLER's bed; (5) four rifle magazines loaded with ammunition in a rifle case under MILLER's bed; (6) a box of .22 caliber ammunition on a shelf in the basement; (7) a box of rifle ammunition on a shelf in the basement; (8) a box of 9mm Winchester ammunition on a shelf in the basement; (9) a box of ammunition for a .38 special on a shelf in the basement; (10) a box of assorted ammunition in a closet; and (11) a

box of 9 mm ammunition on top of a dresser in MILLER's bedroom. Law enforcement also found armor plates in one of the closets, as well as a tactical vest with pockets for insertion of the plates.

Throughout the residence, law enforcement also observed numerous insignia consistent with white supremacy and white nationalism, including on t-shirts, flags, bumper stickers, and other items in the home. Law enforcement also recovered items indicating MILLER's membership in the Proud Boys organization, including Proud Boys patches. Law enforcement also identified a document relating to elections in the Maryland/District of Columbia Chapter of the Proud Boys. Below is a redacted version of the document:

Welcome to the third open election of Proud Boys Maryland/District of Columbia chapter. You must be of 2nd degree status to participate in this election. The following are the open positions for which you can vote. Please circle a name (or names) as listed in each category below. You are welcome to turn in a "blank ballot" on any field if you wish to abstain. Each anonymous vote will be read publicly after the count. Should there be any discrepancy, a public viewing of these paper votes will be shown to the group. The ballots will be destroyed after the titles are called and there are no discrepancies. All new leadership positions will be transitioned effective after the election.

## President (Pick 1)

Overall leader and overseer of the group. Holds highest authority during meetings, events, and rallies. Can issue "gear up" order. Can delegate an acting "VP" and "LTs" during events and rallies in the absence of other members of leadership. During rallies or events, can act alone as deciding factor on Media outlets and issuing demerits.

███████████████

## Vice President (Pick 1)

Deputy leader to group. Acts as President in his absence. Can issue "gear up" order. Can delegate acting "LTs" during events and rallies in the absence of other members of leadership. Holds similar voting weight to President during votes in his absence. Also in charge of disciplinary purposes beyond that of 1st demerit.

███████████████

## Lieutenant (Pick 3)

Holds some authority during meetings, events, and rallies. In the event of senior leadership missing, one could be appointed to Commanding Officer for the event or outing. Should all three Lieutenants be in agreement during a vote against ONE member of senior leadership (President, Vice President), the decision will go in favor of junior leadership. Enforces media blackout order during rallies. Can issue "gear up" order when corresponding.

███████████████

## Consul Legate

Advising role to leadership. Holds authority during meetings, events, and rallies - but not to exceed that of a Lieutenant. Can issue "gear up" order. Only given voting privileges during leadership meetings in the event of a stalemate between senior leadership and junior leadership (President and VP voting vs. all 3 LTs).

-Scott "Scotch" Thomas

This document indicates MILLER[5] may have been elected as a "Consul Legate" which is described as an "advising role to leadership. Holds authority during meetings, events, and rallies – but not to exceed that of a Lieutenant. Can issue 'gear up' order. Only given voting privileges during leadership meetings in the event of a stalemate between senior leadership and junior leadership."

### C.  Procedural Background

MILLER was arrested on or about December 16, 2021, pursuant to a criminal complaint. On the same date, U.S. Pretrial Services issued its Pretrial Services Report and recommended detaining MILLER based on a finding that there is no condition or combination of conditions that could assure the safety of the community or defendant's appearance in this case. MILLER had his initial appearance on the same date. During the initial appearance, Magistrate Judge Meriweather temporarily detained MILLER on the government's motion pursuant to 18 U.S.C. § 3142(f)(1)(A). Magistrate Judge Meriweather set a detention hearing for December 21, 2022, at 12:30 p.m.

### LEGAL STANDARD

As a preliminary matter, "the rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 19896); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be

---

[5] The above document refers to "Scott 'Scotch' Thomas." Based on encrypted messages obtained during a related investigation, as discussed below, law enforcement believes "Scotch" is a nickname MILLER utilized as part of his participation in the Proud Boys organization.

used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. At 36.

Under the Bail Reform Act, a defendant must be detained if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of the community, the Court must take into account: (1) the nature and circumstance of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, and physical and mental condition; (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. *Id*. § 3142(g).

## ARGUMENT

MILLER should be detained because there is no condition or combination of conditions that can reasonably assure the safety of the community.

## I.     The Nature and Circumstances of the Offense Support Detention.

On January 6, 2021, MILLER joined hundreds of other rioters who attacked the U.S. Capitol in an effort to stop Congress's certification of the 2020 election results. MILLER's participation in the riot was particularly violent. MILLER, who donned large orange ski goggles, a tan jacket and tactical gloves, made his way through the dense crowd at the U.S. Capitol grounds to the front of the police line at an entrance to the U.S. Capitol on the Lower West Terrace known as "the tunnel." The officers located at the tunnel withstood approximately two and a half hours of physical attacks by the mob as they defended the Capitol. MILLER was located at the tunnel for

approximately twenty minutes of this time, during which he committed multiple crimes. For example, during that time he: (1) struck Metropolitan Police Department ("MPD") Officer L.M. with a long pole; (2) threw at least four items at the officers who were defending the tunnel, including what appears to be a pipe, a bottle, an audio speaker, and an item of clothing; (3) struck or jabbed multiple other officers with a long blue and white pole; and (4) forcibly stole a U.S. Capitol Police riot shield out of the hands of two MPD officers.

Even in a vacuum, MILLER's violence is disturbing. But when placed into the context of an attack on the United States Capitol, MILLER's violent actions show his "disregard for the institutions of government and the rule of law." *United States v. Chrestman*, 525 F. Supp. 3d 14, 27 (D.D.C. 2021) (C.J. Howell) (overturning an order releasing defendant Chrestman who was a leader of the Kansas City chapter of the Proud Boys organization and who conspired with others to interrupt the electoral certification on January 6, 2021, by, among other things, donning tactical gear, carrying an axe handle, and obstructing metal barriers to the Capitol). MILLER's violence on January 6th was directed at the police who were far outnumbered and who worked tirelessly to defend the seat of our government against attack. MILLER's violence had purpose and was not the result of a momentary lack of judgment. He attacked the police in order to stop an election. In this way, his violence was of the most dangerous kind because it was aimed squarely at the rule of law.

In *United States v. Chrestman*, Chief Judge Howell identified a number of additional factors relating to the nature and circumstances of the offense that courts should consider when evaluating pretrial detention in a case involving the attack on the U.S. Capitol. *Id.* at 26. For example, Chief Judge Howell stated that the first "differentiating factor" is "whether a defendant is charged with felony or misdemeanor offenses." *Id.* Here, the criminal complaint charges

defendant with at least two felony offenses – namely, violations of 18 U.S.C. §§ 231(a) (civil disorder) and 111(b) (assaulting an officer with a dangerous weapon). Thus, this factor weighs in favor of detention. *See Chrestman*, 525 F. Supp. 3d at 26 ("The nature of a felony offense is … substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense.").

Chief Judge Howell also held that additional "differentiating factors" for January 6 cases include "any evidence that a defendant engaged in prior planning before arriving at the Capitol" and "[e]vidence of coordination with other participants." *Id.* ("The presence of [coordination with others] enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of the conduct."). During the investigation, law enforcement learned that MILLER participated in a group chat with other members of the Maryland/District of Columbia Chapter of the Proud Boys about January 6. Specifically, MILLER was one of multiple individuals on a group chat called "Cleared for Entry" on an encrypted messaging application. The chat, which was recovered by law enforcement from another member's phone during the investigation, included members of the Maryland/District of Columbia Proud Boys chapter. The chapter used the "Cleared for Entry" chat to discuss plans to travel to the Capitol on January 6, 2021. For example, on January 4, 2021, one of the participants in the chat stated, "Im going to assume we all know the thing kicks off at the ellipse at 11 and the march will be to the capitol building. Im bringing a couple of urinals/piss bottles/new ….. and as much beer as possible. Lets try to connect at some point….. What is the driving/parking plan." The participants also used the chat on January 6th to discuss their efforts to get into the building. For example. At approximately 2:06 p.m., one of the participants in the chat sent a message stating, "Where are you all at." At approximately 2:23 p.m.,

another participant responded stating, "We're in!" Similarly, at 3:13 p.m., another participant sent a message stating, "We have breached the Capital Capital whooohoo go boyzzzz."

MILLER was one of the participants in the "Cleared for Entry" chat under the username "Jefferson scotch Freeman" and sent messages to the group about January 6. For example, on December 29, 2020, a participant in the chat sent a message about a hotel that was closing on January 4th, 5th, and 6th because "they don't want the proud boys there." MILLER responded, "Lol that's what they think" and "Dress warm and bring liquor. Problem solved." Later that same evening, MILLER sent a message stating, "I cannot possibly describe how much I hate the people of Washington DC. I literally want Al Qaeda to invade the district and behead every Washingtonian using plastic sporks…" On January 5, the participants in the group chat were discussing renting rooms at a hotel in Washington DC on January 6 and MILLER stated, "Good deal, be SUPER INCOGNITO when you're going in/out of your hotel. Last time we were in DC some of our guys got barricaded in theirs by MPD bous antifa swarmed the place when they found out pbs [Proud Boys] were there."

On the evening of January 6, MILLER sent a message to the chat requesting help with a flat tire, stating, "I have $200 for anyone who is willing to bring a floor jack and spare tire into dc for me." Based on messages exchanged later that night, another Proud Boy member came to MILLER's aid. Later that evening, the participants in the chat discussed destroying the chat. One of the participants messaged at approximately 8:56 p.m. "Yo real quick im just putting it out there I will be nuking this group tomorrow and sticking you all in a different one." In response to a comment from another participant, the same individual said, "Lol no hate we are just scrubbing our records. The last message in the "Cleared for Entry" group chat, which was sent by MILLER, occurred shortly thereafter at approximately 9:28 p.m. on January 6.

MILLER's participation in the "Cleared for Entry" chat with other Proud Boys members shows he planned in advance to travel to Washington, D.C. on January 6 and coordinated with other Proud Boys members while at the U.S. Capitol. MILLER's attendance at the riot was therefore, a preplanned and premeditated attack on our government. *See Chrestman*, 525 F. Supp. 3d at 26 ("These motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole.").

Finally, Chief Judge Howell also noted that "a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises. Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement…." As set out above, MILLER not only assaulted multiple officers on January 6, he also stole government property. So this "differentiating factor" also supports MILLER's detention.

Thus, the nature and circumstances of the offense – including each of the "differentiating factors" identified by Chief Judge Howell – support detention in this case.

## II. The Weight of the Evidence Against Defendant Supports Detention.

The government has strong evidence proving that MILLER committed the crimes with which he is charged. For example, there are several videos – including MPD body worn camera footage, CCTV footage, and public video – that depict MILLER's assaults of officers and his theft of the riot shield.

Similarly, the government has strong evidence that MILLER was the individual who committed these crimes on January 6. Not only did two of MILLER's coworkers positively identify photographs of BOLO #132 as MILLER, but law enforcement located some of the items of clothing worn by MILLER – including his tan jacket and black gloves – in MILLER's residence on the day of his arrest. The "Cleared for Entry" group chat also proves that MILLER was at the U.S. Capitol on January 6. Therefore, the weight of the evidence also supports MILLER's detention.

### III.     Defendant's History and Characteristics Support Detention.

MILLER has one prior arrest in his criminal history and no criminal convictions. Specifically, in June 2019, MILLER was arrested and charged with disorderly conduct, disturbing the peace and assault. According to an article in the Seattle Times dated July 2, 2019, MILLER was arrested at an event entitled "Drag Queen Story Time" at a library in Millersville, Maryland.[6] The article indicates that MILLER and another individual attended the event and began shouting at the performer. When he was confronted by one of the library's board members, MILLER shoved the man and was arrested. MILLER's arrest and alleged use of violence at a children's event at a library further demonstrates MILLER's propensity to use violence to demonstrate his opinions and beliefs, even in entirely inappropriate settings: like children's events and government buildings.

Additionally, MILLER appears to be a leading member of the Maryland/District of Columbia chapter of the Proud Boys organization. His involvement with the organization reflects support for political violence and "Western chauvinism" promoted by the Proud Boys. Inherent in the group is support for violence: to attain the highest "degree" of membership generally requires

---

[6] The article is available online at https://www.seattletimes.com/nation-world/nation/maryland-man-charged-in-drag-queen-storytime-scuffle/

engaging in a physical fight with a member of Antifa, and many of the comments in the Cleared for Entry chat, discussed above, support the use of violence.  Additionally, in his position with the Proud Boys, MILLER has the ability to issue "gear up" orders. In other words, MILLER not only has a penchant for using violence himself, but based on his role with the Proud Boys, he also has the power to call upon other like-minded men to serve the Proud Boys' pro-violence goals.

MILLER's history and characteristics – namely his history of political violence, as well as his membership in the Proud Boys organization – support detention.

## IV.     Defendant is a Danger to the Community.

MILLER is charged with attacking officers defending the U.S. Capitol on January 6, 2021. His actions on that day demonstrate his willingness to employ violence on behalf of his political beliefs. His prior arrest for allegedly using violence at a children's event further confirms this trait. MILLER is also not only a member, but a leader, of an organization known to employ violence in service of its goals, including violence on January 6, 2021. It also appears from law enforcement's search of MILLER's home that MILLER has easy access to multiple guns and hundreds of rounds of ammunition. What's more, MILLER appears to have the knowledge, ability and tools necessary to assemble guns himself, as is evidenced by the assault rifle parts and assembly blueprint found in his home.

In summary, MILLER has a history of using violence to assert his beliefs, he has easy access to guns, and the ability to call others to action. MILLER is a danger to the community, and he should be detained pending trial.

## CONCLUSION

For each of the foregoing reasons, the government, in agreement with U.S. Pretrial Services, respectfully asks the Court to detain defendant SCOTT MILLER pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Kaitlin Klamann
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov