UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **Crim. Action No.: 22MJ276** |
| **SCOTT MILLER,** | |
| Defendant. | |

## SCOTT MILLER'S RESPONSE TO THE GOVERNMENT'S MOTION FOR PRE-TRIAL DETENTION

Scott Miller, through counsel, respectfully opposes the government's motion for detention in this case and seeks his release on conditions of home confinement and any other conditions the Court deems appropriate pursuant to the Bail Reform Act, 18 U.S.C. § 3142.

Mr. Miller is a 31-year-old with no prior criminal convictions. He is a college graduate with a B.S. in degree in public health. He is newly married and gainfully employed, building houses. Prior to his current work, Mr. Miller fought fires in Oregon and worked as an EMT in the District of Columbia.

Mr. Miller traveled to the Capitol alone on January 6 to attend President Trump's rally. Though he is a lawful firearms owner, he did not bring any weapons of any kind. When violence erupted at the rally, Mr. Miller reacted, but unlike the defendants who have been preventatively detained in these cases, he did not injure anyone. Also unlike the few defendants that have been detained, after January 6, Mr. Miller did not publicly glorify what happened on January 6 or otherwise espouse

violence. Nor did he did attend any political events or protests after January 6. As discussed below, shortly after January 6, Mr. Miller resigned from the Proud Boys by way of a hand-written letter of resignation and he has since cut all ties with the group. Indeed, there is no evidence that Mr. Miller has been anything but a law-abiding citizen for the past two years.

Mr. Miller was arrested in his home in Maryland on December 16, 2022, and charged by complaint with various offenses arising out of January 6, 2021.

The government seeks detention based primarily on its contention that almost two years ago, Mr. Miller allegedly assaulted police officers with a dangerous weapon. However, the video shows that whatever items Mr. Miller may have had in his hands—which appear to be one malleable cylindrical item and three smaller items—do not qualify as "dangerous weapons," and that he did not physically injure anyone. Therefore, detention is not warranted under 18 U.S.C. § 3142(f)(1). As such, the government must rely on § 3142(f)(2), which requires evidence that there is a serious risk that Mr. Miller will flee; or, in the alternative, a serious risk that Mr. Miller will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. 18 U.S.C. § 3142(f)(2). Because the government clearly cannot satisfy either basis, there are no grounds for detention in this case.

Moreover, even if the Court were to find that the items qualify as dangerous weapon, the DC Circuit's controlling holding in *Munchel v. United States* proscribes detention here: given the lack of evidence that Mr. Miller pre-planned violence on

January 6 and the abundant evidence that he has been in the community for almost two years without any indication that he is a danger to the community, the government cannot articulate a specific danger to the community beyond the scope of the January 6th events. 991 F.3d 1273, 1283 (D.C. Cir. 2021). For reasons discussed below, the government's allegations as to January 6 do not override the other factors in the Bail Reform Act that weigh towards release.

## ARGUMENT

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §§ 3142(b), (c)(1)(B).

The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

The government bears the burden of demonstrating, by clear and convincing evidence, that preventative detention is necessary to ensure the safety of the community.

**A. The government cannot establish that the items Mr. Miller allegedly held qualify as "dangerous weapons."**

The video footage submitted by the government show that whatever Mr. Miller had in his hands do not qualify as dangerous weapon, as defined by the D.C. Circuit:

> In the District of Columbia, a dangerous weapon is anything that is *likely* to produce death or great bodily injury by the use made of it. An object is likely to produce great bodily injury if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used. *United States v. Broadie*, 452 F.3d 875, 881–82 (D.C. Cir. 2006) (citing *Strong v. United States*, 581 A.2d 383, 386 (D.C.1990)) (internal quotations omitted).

This dual-prong approach was recently reiterated by this Court in the context of the January 6th events. *See United States v. Klein*, No. CR 21-236 (JDB), 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) (citing *Bullock*, 970 F.3d); *see also United States v. Chansley*, No. 21-CR-3 (RCL), 2021 WL 861079, at *7 (D.D.C. Mar. 8, 2021) (noting that the Bail Reform Act does not provide a definition for "dangerous weapon" and relying on court holdings in similar contexts elsewhere in Title 18). Significantly, in some contexts, even otherwise dangerous objects such as knives are not inherently dangerous weapons merely because they have the *potential* to cause injury. *See Broadie*, 452 F.3d at 882. This is because knives have alternative primary uses.

Instead, for an object to be "inherently dangerous," its primary or ordinary use must be *likely* to cause great bodily injury. *Id.* at 881 (emphasis added).

Serious bodily injury is defined as bodily injury "which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365.

The government identifies Mr. Miller as having various items in his hands: 1) a small cylinder shaped item; 2) a longer blue cylinder shaped item which appears to to bend such that it cannot be said to be metal; 3) two small object which the government alleges Mr. Miller threw. While the actions depicted on the video may establish probable cause as to 18 U.S.C. § 111(a), it does not appear that these items could cause "serious bodily injury." The best evidence of this is, of course, the fact that nobody was harmed by these items: no bodily injury, "serious" or otherwise, resulted. Because the government cannot establish that the items Mr. Miller allegedly possessed were used in a used in a manner likely to cause great bodily harm, it fails to satisfy the second *Broadie* basis for qualifying as a dangerous weapon. *Broadie*, 452 F.3d at 881-82. As such, the government cannot establish that the objects was dangerous weapon under either *Broadie* prong for the purposes of § 111(b).

**B. The government cannot prove by clear and convincing evidence that detention is necessary to assure the safety of the community.**

Even if the Court finds that one or each of the objects constitute a dangerous weapon, under the Bail Reform Act, the Court must consider the following factors when determining whether the government has set forth clear and convincing

5

evidence that Mr. Miller be detained: 1) the nature and circumstances of the offense charged; 2) the weight of the evidence; 3) the history and characteristics of the person charged; and 4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. § 3142(g). As explored *infra*, the balance of these factors weighs strongly in favor of release. As such, this Court should release Mr. Miller with the conditions it deems necessary.

**1. The Nature and Circumstances of the Offense Charged**

Mr. Miller traveled to Washington D.C. by himself to attend President Trump's stop the Steal Rally. As a political conservative with libertarian views, Mr. Miller tended to support republican candidates and—like millions of Americans—was especially drawn to President Trump. He felt that the President truly cared about the American people and Mr. Miller aligned with the President's conservative values. In the days leading up to January 6, Mr. Miller had been planning to go the rally to support the President. But when his truck broke down and he had to buy a new one, he did not know if he would go. As his wife explains in her letter to the Court, after he picked up his new truck he made a somewhat last minute decision to go. He never intended to engage in any violence, despite the government's speculation that his brief messages on a chat were indicative of elaborate "pre-planning" and a plan to commit violence. Instead, the person the government identifies as Mr. Miller did not make any references to a specific plan to commit violence.[1] Mr. Miller did not bring any weapons with him to the rally, despite being a lawful firearms owner. But more

---

[1] The person identified as Mr. Miller asked if anyone had a spare tire for his truck because his tire was slashed while he was at the rally.

6

importantly, since January 6, 2021, there is no evidence that Mr. Miller glorified the chaos the erupted after President Trump urged his supporters to meet him at the Capitol[2] nor did he boast about his role in the protest. And, significantly, he resigned from the Proud Boys. As the attached letters attest, Mr. Miller has been employed and law-abiding. To underscore the lack of danger Mr. Miller presents, it is important to contextualize the alleged conduct. The following cases are those in which defendants were released notwithstanding the government's allegations of threatening and violent conduct:

- *United States v. Michael Foy*, 1:21CR108(TSC). Mr. Foy was in the same area as Mr. Miller was—positioned at the entrance of the "tunnel" and is alleged to have thrown a sharpened pole at officers. He is also alleged to have struck officers with a hockey stick. Unlike Mr. Miller, Mr. Foy is alleged to have entered the Capitol building. Photos from the government's detention memo, ECF. No. 11:

 

---

[22] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added)

7

After acknowledging that 18 U.S.C. § 111(b) is not an offense for which there is a presumption for detention under the Bail Reform Act, the Honorable Judge Chutkan released Mr. Foy to home incarceration. ECF. No. 44. A review of the docket shows that defendant Foy has since been compliant with conditions of release and Judge Chutkan has since modified Foy's conditions of release.

- *United States v. Robert Sanford,* 1:21CR52(PLF), Sanford is alleged to have hurled a fire extinguisher into a crowd of police officers and striking at least three officers in the head. Video footage allegedly captures Sanford screaming "traitors" and "cowards" at the officers. *See* ECF. No. 10 (Government's Opposition to Defendant's Motion to Reconsider Detention). Like Mr. Miller, Sanford was charged with, *inter alia,* assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b). Yet on March 2, 2021, Judge Friedman granted Sanford's motion for release and placed him on GPS monitoring. ECF. No. 11.

- *United States v. David Alan Blair,* 1:21CR86(CRC) Blair was captured on body worn camera brandishing a lacrosse stick which served as a pole for a large confederate flag. *See* ECF. No. 1 (Complaint and Statement of Facts). While walking back and forth between the crowd and police officers, Blair is alleged to have exhorted, "hell naw, quit backing up, don't be scared. . .". As an officer advanced, Blair yelled at the officer: "what's up motherfucker, what's up, what's up bitch." *Id*.  He then struck the officer in the chest with

the lacrosse stick and had to be forcibly restrained by multiple officers *Id*. Notwithstanding this *direct* physical assault with a lacrosse stick, Blair was ordered released conditions. ECF No. 6. Like Mr. Miller, Blair is charged with, *inter alia*, assaulting police officers using a dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

- *United States v. Federico Klein,* 1:21CR236(TNM), Klein is depicted on body worn camera "wedging [the] shield between the doors to the Capitol at approximately 3:00 p.m. in an apparent effort to prevent the officers from closing the doors." ECF. No. 29, p. 3 (Order granting motion to revoke detention order). Another video showed Klein "pushing the shield into an officer's body in an attempt to break the police line." Id. Despite this direct contact, the Court concluded that "Klein does not pose a substantial prospective threat to the community or any other person." *Id*. at 25. Likewise, in Mr. Miller's case, the government cannot show that he poses a continuing danger to the community, especially now that the events of January 6 have dissipated and Mr. Miller has been in the community for two years without incident.

- *United States v. David Judd,* 1:21CR40, defendant Judd was alleged to have tossed a lit firework into the inaugural tunnel towards a line of police officers and charged with inter alia, 18 U.S.C.§ 111(b).[3] He has since entered into a stipulated trial agreement with the government. The

---

[3] Judd has since entered into a stipulated trial agreement with the government.

government opposed his pre-trial release. The Honorable Judge Merriweather released defendant Judd over the government's objection. ECF. No. 60. A review of the docket shows that Mr. Judd has been compliant with all conditions of release since May 2021.

**2. The weight of the evidence**

While the weight of the evidence that Mr. Miller attended the Stop the Steal rally is strong, the evidence that he used a dangerous a weapon to assault officers is not for the reasons described above, therefore detention is not warranted under 18 U.S.C. § 3142(f)(1). There is likewise no basis – and the government does not assert one— that detention is warranted under 18 U.S.C. § 3142(f)(2).

**3. Mr. Miller's history and characteristics**

Mr. Miller is 31 years old. He has no prior convictions. He builds home with NVR, inc., a homebuilding and mortgage company. His one prior brush with the law resulted in a "stet docket" resolution, through which his record was expunged after successful completion of community service. The defense respectfully submits that the Court should decline the government's invitation to overemphasize the significance of Mr. Miller's single prior arrest. The diversionary resolution in that case reflects what it was: disorderly conduct in a library. Contrary to the government's hyperbolic speculation that the incident reflects "a propensity to use violence to demonstrate his opinions" the incident shows that Mr. Miller was able to comply with the diversionary agreement, as reflected by his lack of a criminal record.

The government's reliance on Mr. Miller's prior affiliation with the Proud Boys is also misplaced. For one, Mr. Miller did not plan to commit any violence with the group and has since resigned from the organization entirely. While Mr. Miller's prior affiliation with the group is regrettable to say the least, an affiliation with a group *where there is no indication that he planned or engaged in criminal activity with the group* cannot be the basis for pre-trial detention in our criminal legal system where defendants are presumed innocent and therefore "liberty is the norm" and pre-trial detention "the carefully limited exception." *Salerno*, 481 U.S. at 755.

The government also points to ammunition and firearms that were recovered from Mr. Miller's home. Again, there is no evidence that Mr. Miller brought a firearm to the Stop the Steal rally—indeed, there is no evidence that he ever used a firearm for violence in any context. That said, any concern about the Court may have about access to firearms can be addressed by the standard condition Mr. Miller not possess any firearms. Once this condition is in place, Pre-Trial Services can ensure that all firearms and ammunition are removed from the home. Likewise, any concern that Mr. Miller might find another way to access a firearm can be addressed by GPS monitoring and a stay-away order from firearms dealers/ locations where Mr. Miller might be able to access a firearm. Finally, pre-trial services has deemed Mr. Miller's wife, Angela Ware, to be a suitable and safe third-party custodian. Ms. Ware will assure this Court that the couple will not possess any firearms in the home.

**4. Mr. Miller does not pose a danger to the community.**

The best evidence that Mr. Miller does not pose a danger to the community in general is his conduct over the past two years since January 6. As the attached letters show, Mr. Miller is in a stable and healthy relationship with his wife, Ms. Ware. He is gainfully employed and engages in volunteer activities such as volunteer firefighter. He is described as a kind and respectful neighbor, son, husband, and friend.

The D.C. Circuit has made clear that detention is not appropriate for all January 6 defendants. *Munchel*, 991 F.3d. at 1238. Instead, detention is only warranted where the Court can identify "an articulable threat" posed to an individual or the community separate from January 6. Two years after the fact, an event like January 6 is unlikely to happen again, so the volatile mix of circumstances in which many otherwise law-abiding Americans were incited to violence by none other than the President of the United States himself are not going repeat themselves.[4] Under 18 U.S.C. §3142(f), the Court is required to release the defendant under the "least restrictive condition or combination of conditions" to ensure the safety of the community. The past two years since January 6 show that the circumstances surrounding Mr. Miller's alleged offenses will not be repeated and that Mr. Miller does not generally pose a threat to

---

[4] See transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").

12

the community. Any concerns the Court may have can be met by carefully-tailored conditions of release.

## Conclusion

Wherefore, for the foregoing reasons, the government has not met its burden of demonstrating that there no conditions or combination of conditions that will assure the safety of the community. Mr. Miller respectfully requests that the Court release him with conditions the Court deems appropriate.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500