**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 22-mj-276** |
| **SCOTT MILLER,** | **Magistrate Judge Moxila A. Upadhyaya** |
| **Defendant.** | |

**GOVERNMENT'S SUPPLEMENTAL**
**MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

Defendant Scott Miller waged at least five separate attacks against police officers over a period of approximately twenty minutes while they were defending an entrance to the U.S. Capitol on the Lower West Terrace known as "the tunnel." He hit them repeatedly with poles, threw items at them and stole a riot shield out of their hands. His actions on January 6 show he is in "a different category of dangerousness" than many other defendants who have been charged in January 6 cases and should be detained pending trial. *See United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021) ("Those who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way.").

On December 21, 2021, this Court held a detention hearing in this case. At that time, the Court requested supplemental briefing from the parties on numerous topics, including information relating to cases that are factually similar to defendant's case. The information requested from the government is set out in detail below and further demonstrates defendant's dangerousness and the need for pretrial detention.

### A.  Detention Decisions in Other January 6 Cases

At a detention proceeding, the question before the Court is whether a defendant is a danger to the community or poses a serious risk of flight. *See* 18 U.S.C. § 3142(e)(1). In this way, a detention determination is highly individualized and focuses on the aspects of the particular defendant's alleged offense and background. *See* 18 U.S.C. § 3142(g) (setting out the four factors a court must consider at a detention hearing, including the nature and circumstances of defendant's alleged offense, defendant's history and characteristics, the weight of the evidence against the defendant and the nature and seriousness of the danger to the community if the defendant was released). S*ee also Munchel*, 991 F.3d at 1283 ("[W]hether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant"); *United States v. Klein*, Case No. 21-CR-00236, Dkt. Entry 29 (Bates, J.) ("Of course, any determination of dangerousness must rest on the specific circumstances of each defendant."). Thus, a detention determination is distinguishable from a sentencing hearing. *See* 18 U.S.C. 3553(a) (listing the factors a court must consider at a sentencing hearing, including "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.").

At the initial detention hearing, the Court requested additional information from the parties about detention dispositions for similarly situated defendants. The government provides the following information in response to the Court's request.

### a.  Cases Cited in Defendant's Response to the Government's Detention Memorandum

Defendant's Response to the Government's Motion for Pretrial Detention lists five cases in which courts have ordered defendants in January 6 cases released. As set out below, the facts in each of these cases is different from the facts in defendant's case.

In *United States v. Foy*, Foy, a former Marine, assaulted a group of MPD officers with a hockey stick for a period of approximately 16 seconds. *See* Statement of Facts, 21 CR 108, Dkt. Entry 1. Initially, Foy was detained for more than three months pending trial – first, by the District Court for the Eastern District of Michigan and then by Judge Chutkan. Judge Chutkan granted a subsequent motion by Foy for release finding that Foy's "history and characteristics tip[ped] the scales – just barely – in favor of his release." *See* Memorandum Opinion, 21 CR 108, Dkt. Entry 44 at 8. Judge Chutkan also noted that, "unlike other January 6 cases, there is no evidence that Foy planned in advance . . . or coordinated with other participants." *Id.* Thus, the *Foy* case is distinguishable from defendant's case in several ways: (1) Foy committed one assault on January 6 as compared with defendant's multiple assaults; (2) Foy did not steal a U.S. Capitol Police riot shield from police; (3) Foy was a former service member with history of violence; and (4) there was no evidence that Foy planned in advance to attack the Capitol or coordinated with other participants.

In *United States v. Sanford*, Sanford threw a fire extinguisher at police officers, striking three of them in the head. *See* Statement of Facts, 21 CR 89, Dkt. Entry 1. Again, Sanford committed a serious assault on January 6, but defendant committed several serious assaults. It also appears that – like Foy – Sanford did not plan to attack or coordinate his attacks on January 6 with others, or have access to firearms, or belong to any extremist groups.

In *United States v. Blair*, Blair was arrested on January 6, 2021, after he threatened officers and struck an officer with a lacrosse stick attached to a confederate flag. *See* Statement of Facts, 21 CR 186, Dkt. Entry 1. Blair's assault took place later in the day after most of the rioters had been expelled from Capitol grounds and at a time when the police had regained control of the situation. In this way, his assault is distinguishable from defendant's multiple assaults at the tunnel

at a time and location when police defending the Capitol were far outnumbered and the U.S. Capitol was overrun with rioters. Additionally, Blair was initially charged with 18 U.S.C. § 111(a) and only later charged in an indictment with 18 U.S.C. § 111(b). Blair's case was one of the very first cases charged following January 6. Thus, his case is not a good comparator with most other January 6 cases since at that time the government's charging options were not fully developed.

In *United States v. Klein*, Klein pushed against officers in the tunnel. *See* Statement of Facts, 21 CR 236, Dkt. Entry 1. At one point, Klein used a U.S. Capitol Police riot shield to physically push against officers. *Id.* Klein also encouraged other people to push against police, calling out "we need fresh people" to nearby rioters. *Id.* Later, Klein helped an officer who had been dragged into the crowd get back to the tunnel. *Id.* Klein was initially detained pending trial by Magistrate Judge Harvey. *See* Order of Detention Pending Trial, 21 CR 236, Dkt. Entry 11. Judge Bates later granted Klein's motion to revoke pretrial detention. *See* Memorandum Opinion, 21 CR 236, Dkt. Entry 29. Judge Bates noted that there was no evidence that Klein planned his conduct before arriving at the Capitol or coordinated with other participants on January 6. *Id.* at 14-15. Judge Bates also found that Klein's case is "distinguishable from other detained defendants charged under § 111(b) who clearly sought to incapacitate and injure members of law enforcement by striking them with fists, batons, baseball bats, *poles*, or other dangerous weapons." *Id.* at 16 (emphasis added). Judge Bates also found it significant that Klein honorably served in the Iraq War as a Marine, was a political appointee in the State Department, and had no known ties to any extremist groups. *Id.* Thus, this case too is distinguishable because (1) Klein, unlike defendant, did not coordinate his attack on the Capitol on January 6 with others; (2) defendant struck (rather than pushed) officers with a dangerous weapon; and (3) Klein had a history as a government employee and former Marine.

In *United States v. Judd*, Judd participated in the rioters' push against officers at the tunnel, assisted in creating a shield wall, and threw a lit device, which appeared to be a firecracker,[1] into the tunnel at officers. *See* Statement of Facts, 21 CR 40, Dkt. Entry 1. Judd also possessed two firearms in his home at the time of his arrest. *See* Memorandum in Support of Pretrial Detention by USA, 21 CR 40, Dkt Entry 44. While Judd's actions on January 6 were serious, defendant's five concerted attacks on police officers defending the tunnel were arguably more serious. There also appears to have been no evidence that Judd coordinated with others on January 6 or planned ahead to attack the Capitol, nor is there any evidence Judd was affiliated with any extremist groups.

### b.   *United States v. Hatchet Speed*

At the detention hearing, the Court requested a comparison between this case and the case of Hatchet Speed.  *United States v. Hatchet Speed*, 22 CR 244. First, Speed is not charged with any felonies but instead is charged with only misdemeanor offenses. *See* 22 CR 244. *See also United States v. Chrestman*, 525 F. Supp. 3d 14, 26 (D.D.C. 2021) ("Felony charges are by definition more serious than misdemeanor charges."). Speed is also not charged with the commission of any assaults or theft of government property, which makes his case markedly different from defendant's case. With respect to Speed's residency at the time he was charged, Speed had a permanent residence at the time he was arrested. However, because of the presence of firearms in his home, Speed was required to live at another location as a condition of his release. Speed chose to live in a motel. For all of these reasons, the government's detention recommendation in *Speed* differs from its recommendation in this case.

---

[1] The item in question was never recovered and there was no corresponding explosion.  Stills of video reveal a small item with a lit fuse, similar in nature to a small explosive or firecracker, but the government has not been able to conclusively determine what Judd threw.

### c.  Other Comparable Cases

At the initial detention hearing, the government provided the Court with names of January 6 defendants whose conduct was factually similar to the defendant's conduct, and who were detained pending trial. Each of these cases, listed below, involves a defendant who committed multiple violent assaults - typically with a dangerous weapon - and many of these cases involve violent assaults at the tunnel, in particular. Additionally, many of the defendants discussed below also had minimal criminal histories, like defendant here.

- *United States v. David Dempsey*, 21 CR 566 (Lamberth, J.). Dempsey used various objects, including a crutch, a metal pole, and projectiles, to hit and strike at officers protecting the entrance to the Capitol building at the tunnel. Dempsey also sprayed officers with pepper spray. Dempsey had a prior arrest in 2019 for allegedly spraying anti-Trump protestors with bear spray. Dempsey was detained pending trial in August 2021 and remains in custody as of this filing.

- *United States v. Schwartz*, 21 CR 178 (Mehta, J.). Schwartz threw a folding chair at police and sprayed police at the lower west terrace multiple times with pepper spray that he obtained from abandoned police duffle bags following their retreat. Schwartz was on probation on January 6 and had several active warrants, as well as a violent criminal history.  He was recently convicted at trial and has been held in pretrial detention since February 2021.

- *United States v. Jeffrey Brown*, 21 CR 178 (Mehta, J.).  Brown, one of Schwartz's co-defendants, was also recently convicted at trial and is now detained.  Brown utilized a canister of pepper spray he was handed in the tunnel to spray the police line.  Although Brown had no prior criminal history and was initially released by a magistrate judge in California, following a government appeal of the magistrate's release order, Acting Chief Judge Contreras ordered Brown held on September 3, 2021.  Brown was ultimately granted temporary release on July 21, 2022, in order to better facilitate his preparation for trial.

- *United States v. Sabol*, 21 CR 35 (Sullivan, J.), Sabol, a geophysicist with no criminal history, acted along with other rioters at the tunnel to drag an MPD officer off of the police line and onto the ground on the steps outside the tunnel. Sabol struck the officer multiple times with the officer's own police baton. Then Sabol ran back to the police line and attempted to grab the leg of a police officer, who kicked Sabol away. A few moments later, Sabol grabbed another police officer and pulled that officer down the stairs, punching the back of the officer as he dragged him. These assaults occurred at approximately the same time as defendant's assaults in this case and defendant is visible in many of the videos depicting Sabol.

Sabol was ordered detained on February 18, 2021, and remains in custody as of this filing. Although co-defendants Mullins, Lopatic, and Barnhart were granted pretrial release, co-defendants Stager, Whitton, McAbee, Courson, and Jersey were all held pretrial at least temporarily.

- *United States v. McGrew*, 21 CR 398 (Howell, J.). McGrew pushed and struck police officers at least three times while inside the U.S. Capitol. For example, when an officer used the officer's baton to attempt to move defendant out of the Rotunda area of the Capitol, McGrew hit the officer and grabbed for his baton. Later, McGrew grabbed another officer's baton before returning it. Then McGrew locked arms with other rioters and stood still in defiance of officer's orders to vacate the Rotunda. After McGrew was expelled from the Capitol building, he traveled to the tunnel. While standing near the tunnel, he threw a wooden handrail with metal brackets into the tunnel and toward officers. McGrew then joined other rioters and pushed against the police line at the tunnel in an effort to breach the police line. McGrew was detained pending trial and remains in custody as of this filing.

- *United States v. Thomas Webster*, 21 CR 208 (Mehta, J.). Webster assaulted an MPD officer on the West Front of the Capitol grounds after striking the officer with a metal flagpole. Officers successfully disarmed Webster, but Webster then lunged at an officer, tackled him to the ground, and forcibly attempted to remove the officer's face shield and gas mask. Webster had no criminal history and his assault of the officer, while serious, was a single assault and momentary in nature. Webster was initially detained in February 2021, before he was then released into the High Intensity Supervision Program on June 29, 2021.

- *United States v. Quaglin*, 21 CR 40 (McFadden, J.). Quaglin committed multiple assaults while on the Lower West Terrace near the tunnel. First, he shoved a police officer holding the perimeter around the Lower West Terrace. Then, he approached the police line and grabbed a U.S. Capitol Police officer by the neck. One minute later, Quaglin then physically pushed the officer again, as well as three other officers. As the police begin to retreat, Quaglin pursued them and shoved more officers. Ultimately, Quaglin ended up at the tunnel where he approached the police line, attacked officers with a stolen riot shield and sprayed them, at least twice, with pepper spray. Quaglin then participated in a "heave ho" push with other rioters against the police line. Prior to January 6, Quaglin posted numerous messages on social media relating to his plans to travel to Washington, D.C. on January 6. He also posted photographs depicting firearms and tactical gear. He was also a member of the Proud Boys organization. Initially, Judge Faruqui released Quaglin. The government appealed that release order and Chief Judge Howell reversed it, detaining the defendant pending trial.

### d. Detention Decisions in Cases Charged Alleged Members of Proud Boys and Oath Keepers

The Court requested additional information from the government regarding cases in which members of the Proud Boys organization and the Oath Keepers had been detained pending trial.[2] Below is a non-exhaustive list of cases involving members of these groups who have been detained:

- *United States v. Chrestman*, 21 CR 160 (Kelly, J.) Defendant who marched with the Proud Boys to the Capitol, urged the crowd to "take" the Capitol, and then led his four coconspirators in deliberate efforts to prevent Capitol Police from closing the barriers was detained.

- *United States v. Rhodes, et. al.*, 22 CR 15 (Mehta, J.) Ten members of the Oath Keepers were charged with, among other crimes, seditious conspiracy. Four of the ten defendants were detained pending trial, including defendants Rhodes, Meggs, Harrelson and Watkins.

- *United States v. Nordean, et. al.*, 21 CR 175 (Kelly, J.). Six members of the Proud Boys were charged with seditious conspiracy, among other crimes. Four of the six defendants were initially detained pending trial, including defendants Rehl, Donohoe, Tarrio and Pezzola. Defendants Nordean and Biggs were initially released but their release orders were later revoked.

- *United States v. Quaglin*, 21 CR 40 (McFadden, J.). See above.

---

[2] The government maintains that defendant's association with the Proud Boys organization is relevant to detention only with respect to: (1) his planning and coordination with other Proud Boys members to attend the events at the Capitol on January 6; (2) his coordination with other Proud Boys on January 6; and (3) his present dangerousness to the extent his position with the Proud Boys enables him to issue "gear up" orders. To be clear, the government concurs with the defendant that no person should be detained solely because he exercised his First Amendment right to assemble as a group. The defendant's participation in the Proud Boys – in a leadership role permitting the use of force – simply contextualizes the violence he perpetrated on January 6, 2021.

**B.  Defendant's Continued Association with the Proud Boys.**

During the execution of a search warrant at defendant's residence, law enforcement discovered multiple items that indicate defendant may still be a member of the Proud Boys. For example, law enforcement recovered a Proud Boys bumper sticker in the defendant's basement. *See* Exhibit A. Law enforcement also identified a black polo-style shirt in the closet of a spare bedroom that has the Proud Boys "laurel" insignia on the breast. *See* Exhibit B. Defendant's truck, which was parked in the driveway next to the house, also had a Proud Boys bumper sticker affixed to its rear window. *See* Exhibit C. Three patches bearing Proud Boys insignia were also located in the closet of the spare bedroom. *See* Exhibit D. Finally, law enforcement recovered an undated document from defendant's home which indicates that defendant may have been elected to a leadership position in the Proud Boys. *See* Exhibit E.

**C.  The "Cleared for Entry" Chats**

As set out in the government's Memorandum in Support of Pretrial Detention, prior to and including January 6, 2021, defendant participated in a group chat on an encrypted messaging application with other Proud Boys members. Participants in this group chat discussed: (1) plans to travel to Washington D.C., what to wear, and how to act on January 6 *(see* Exhibit F);[3] (2) where and how to buy tactical gear (*see* Exhibit G); (3) the possibility of using violence on January 6 (*see* Exhibit H); (4) their successful breach of the Capitol (*see* Exhibit I); and (5) their need to destroy the chat to evade detection after January 6 (*see* Exhibit J).

Defendant, using the name "Jefferson Scotch Freeman," also sent messages to the group chat. For example, defendant sent messages which indicate he held a leadership role in the

---

[3] Names of other participants in the chat have been redacted from the exhibits, as have links to websites and/or videos. Messages sent by defendant appear in yellow highlighting.

Maryland/District of Columbia chapter of the Proud Boys. *See* Exhibit K. When the group was discussing their plans for January 6, defendant stated he would resist being turned away by DC hotels on January 6 and expressed his hatred in violent terms for the people of Washington D.C. *See* Exhibits L and M. Defendant also advised other Proud Boys members to be "incognito" on January 6 (*see* Exhibit N), and requested help from other Proud Boys members with a flat tire after the attack on the Capitol (*see* Exhibit O).

These chats show that defendant planned ahead to march to the U.S. Capitol after the Stop the Steal Rally. The chats also show that he was in a leadership position with the Proud Boys and likely coordinated with other Proud Boys during the attack on the Capitol. His premeditation and coordination with other Proud Boys is a factor weighing in favor of his detention pending trial.

## CONCLUSION

For the reasons set forth above, and for the reasons set out in the government's Memorandum in Support of Pretrial Detention, the defendant should be detained pending trial because there is no condition or combination of conditions that can reasonably assure the safety of the community.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
IL Bar No. 6316768
(202) 252-6778
Kaitlin.klamann@usdoj.gov