UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SCOTT MILLER,<br><br>    Defendant. | Crim. Action No.: 22CR412 |

### SCOTT MILLER'S RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL BRIEF

Scott Miller, through counsel, respectfully submits this Response to the Government's Supplemental Memorandum in support of detention. Counsel will also seek to address questions raised by the Court at the detention hearing in this matter.

This supplemental Response will elaborate upon the following points raised in the government's Supplemental Memorandum or by the Court: 1) Mr. Miller's proposed third-party custodians are each suitable and able to ensure that Mr. Miller comply with conditions of release; 2) Mr. Miller resigned from the Proud Boys after January 6; 3) defendants similarly situated to Mr. Miller have been released with conditions; 4) the cases the government offers are distinguishable in significant respects.

**1. Mr. Miller's proposed third-party custodians will ensure that he comply with any conditions this Court imposes.**

Mr. Miller has proposed two third-party custodians, both deemed suitable by Pre-Trial Services: Angela Ware, Mr. Miller's wife and Mark Miller, Mr. Miller's father.

Angela Ware, Mr. Miller's wife, resides with him in Smithburg, Maryland. She is a licensed therapist with a private practice based out of Glen Burnie, Maryland. Ms.

Ware sees individual clients, all remotely. She works 5 to 7 hours each day and works from home. Ms. Ware has represented that she can ensure that Mr. Miller have no access to firearms or access to devices which connect to the internet. With respect to the internet, while Ms. Ware needs the internet on her laptop to work, she can change the password to ensure only she has access to the laptop. Mr. Miller and Ms. Ware live ten minutes away from Mr. Miller's job. Should the Court permit Mr. Miller to continue working, counsel submits that Ms. Ware's home is more suitable than Mr. Ware's father's home, which is over an hour from his job.

Should the Court have concerns about Ms. Ware as third-party custodian, Mark Miller is also available. Mark Miller lives in Millersville, Maryland with Mr. Miller's mother, Sally Miller. Mr. Miller is a retired engineer. He recently accepted an at-will position with Northrop Grummond Corporation to work 20 hours a week. When he is work, his wife, Sally Miller, can be home. He represented that he can ensure that Mr. Miller have no access to devices that connect to the internet. Like Ms. Ware, he needs the internet on his laptop, but can ensure that Mr. Miller not use his laptop. Mr. and Mrs. Miller live in a four bedroom house with a detached garage. Should the Court order it, Scott Miller could live in the garage (pictured below) where there is no ability to connect to the internet.



In short, Mr. Miller has presented the Court two suitable third-party custodians, each of whom has the ability to ensure that Mr. Miller comply with any condition of release the Court imposes. Both Angela Ware and the Millers have been approved by pre-trial services to serve as third-party custodians.

### 2. Mr. Miller has resigned from the Proud Boys and no longer associates with the group.

The Court can rest assured that Mr. Miller has fully disassociated from the Proud Boys. On this point, the Court reviewed the letter from Mr. Miller's wife in which she described reading Mr. Miller's resignation letter. In her letter, she explains that she had been urging him to resign and was relieved when he did so. *See* ECF No. 12-1.

Additionally, since the detention hearing, counsel was able to locate the Proud Boys' former chapter head who confirmed that he received a letter of resignation from Mr. Miller. Counsel spoke to this person on the phone on December 22, 2022. The individual, who was adamant that he remain anonymous, confirmed that he was previously the head of the Proud Boys' chapter of which Mr. Miller was previously a member. He confirmed that after January 6, Mr. Miller sent him a handwritten letter disassociating himself with the group and did not attend any meetings thereafter. The individual sent undersigned counsel an email confirming his prior role in the Proud Boys and that he received the letter Mr. Miller sent indicating that he "quit" the Proud Boys. Exhibit 1 (email from former ranking member of the Proud Boys).

### 3. Magistrate and District Judges have released defendants similarly situated to Mr. Miller.


The defense's initial Response highlighted several cases in which defendants were alleged to have engaged in violence at the Capitol were released. ECF. No. 12 at 9, 10. The government's effort to distinguish those cases in any meaningful way falls flat—indeed, these were all cases in which defendants were charged with physically attacking officers and who were released. The defense has since learned of additional cases in which defendants charged with serious violence were released pending trial. These cases further show that release is appropriate in this case:

- *United States v. Ryan Miller*, 21CR75, Miller was charged with assault on law enforcement with a dangerous weapon for discharging a fire extinguisher upon the steps leading to an entrance to the U.S. Capitol building. *See* ECF. No. 13 at 4 (Government's Detention Memo). The defendant self-identifies as a member of the "Patriotic American Cowboys" and donned a flag, known as the Gadsden Flag, during the riots at the U.S. Capitol on January 6, 2021. . . [T]he Gadsden Flag has more recently become a symbol for the Tea Party, Second Amendment advocates, and organizations opposing government overreach." *Id.* at 10. The Court released him with conditions. ECF. No. 22.

- *United States v. Thomas Webster*, 1:21CR208 (APM) Webster was a former New York Police Department officer. Contrary to the government's representation at the hearing, Webster was *released* by the Honorable Judge Mehta into the High Intensity Supervision Program. Webster was later convicted of various offenses, including 18 U.S.C. § 111(b). Unlike Mr. Miller, defendant Webster brought his "off duty" firearm to the Capitol. Additionally, he brought a bulletproof vest and carried a large metal flagpole bearing a Marine Corps Flag. ECF. No. 107 at 15 (Government's Sentencing Memorandum). He was found to have attacked a police officer with a flagpole numerous times. During the assault, he lunged at the policer and tackled him to the ground. He continued to assault the officer for ten minutes while the officer was on the ground. During the assault, Webster tried to remove the officer's shield and gas mask. ECF. No. 1-1 (Statement of Offense). After January 6, he doubled down on his actions, texting a friend, "Never forget this date." ECF. No 107 at 26 (Gov. Sentencing Memo). Though these violent assaults were captured on video and resulted in an officer's injury, Judge Mehta **released** Mr. Webster pending trial. *See* ECF. No. 29.

- *United States v. Zachary Johnson and Dion Rajewski, 1:22CR11(RJL),* Both Johnson and Rajewski are alleged to be members of the Proud Boys and are

4

charged with 18 U.S.C. §111(b). *See* ECF. No. 1 (Indictment). Counsel is aware of the defendants' alleged affiliation with the Proud Boys through another case assigned to the undersigned.

### 4. The government's cases are distinguishable from Mr. Miller in significant respects.

The government's cases are distinguishable from Mr. Miller's case in significant respects. First, unlike Mr. Miller, none of these defendants had a lengthy track record since January 6 of demonstrating they could live safely in the community. By contrast, Mr. Miller has been out for *two years* and has shown absolutely no indication that he poses a danger to the community. Moreover, two of the defendants the government points to had lengthy records and were on probation at the time of the offense or arrest. Several of the defendants in the government's list bragged about their conduct after January 6, suggesting that they were motivated rather than deterred by the violence that broke out. Finally, two of the defendants the government cites made elaborate attempts to flee from law enforcement when they became aware that law enforcement was looking for them. None of these aggravating factors are present in Mr. Miller's case. Specifically, the government's cases are distinguished in the following ways:

- *United States v. David Dempsey*, 21CR566 (RCL) Dempsey was positioned at the mouth of the "tunnel" and allegedly struck officers repeatedly with a metal pole, a crutch, a club-like object, and lacrimal spray. ECF. No. 1-1 (Statement of Facts). Investigation showed that Dempsey changed outfits several times on January 6, 2021, and had a prior arrest for spraying anti-Trump protestors with bear spray. *Id*. When officers went to arrest Dempsey, he was attending another hearing in a criminal case. Notably, a review of the docket shows that *the defense did not object to detention.*

- *United States v. Schwartz*, 21CR278 (APM) Schwartz assaulted multiple officers with bears spray. After January 6, he bragged "he had thrown the first

5

chair at the cops." He committed the assaults while on probation "for multiple other cases involving both assaultive conduct and illegal firearms possession." ECF. No. 178 at 1 (Government's Memorandum in Support of Detention). By contrast, Mr. Miller did not brag about or glorify his actions after the fact. Likewise, he was not on probation for multiple other offenses.

- *United States v. Jeffrey Brown*, 21CR78 (APM) While he was charged with spraying multiple officers with bear spray and initially detained, the Honorable Judge Mehta released Mr. Brown into the high intensity supervision program pending trial. ECF. No. 108, Order Setting Conditions of Release.

- *United States v. Sabol*, 21CR35(EGS) *United States v. Sabol*, 21CR35 (EGS) this case is distinguishable from Mr. Miller's in many respects. The Honorable Judge Sullivan's Order denying release is published at *United States v. Sabol*, 534 F. Supp. 58 (D.D.C. Apr. 14, 2021). While Sabol was also charged with 18 U.S.C. § 111(b), Judge Sullivan's detailed opinion shows that he was also a flight risk. Indeed, the evidence showed that between January 9 and 10, 2021, Mr. Sabol drove from Colorado to Boston and had plans to fly from Boston to Switzerland to avoid prosecution for his crimes on January 6. *Sabol,* 534 F. Supp. 3d at 63. He admitted that he planned to tell law enforcement that he was planning to ski in Switzerland to make his flight look "normal." *Id.* At the airport in Boston, Mr. Sabol saw police officers, left the airport, rented a car and began driving south. While driving, he discarded his phone out the window. *Id.* He was later stopped by law enforcement and admitted to attempting to take his own life. A search of his car uncovered razor blades, a passport, an e-ticket, and other items. *Id.* In light of all of these facts, Judge Sullivan observed that, "**Mr. Sabol is the epitome of a flight risk**." *Id.* at 81 (emphasis added). Moreover, aspects of Sabol's assault are distinguishable Mr. Miller's alleged assault. Video depicted Sabol holding a baton to a police officer's neck and he dragged the officer face down into the crowd. *Id.* at 71. Another Officer (A.W.) needed staples to his head as a result of defendant Sabol's actions. *Id.* Judge Sullivan also emphasized that following the assault, Sabol minimized his involvement by claiming that he was only trying to help an officer. *Id.* None of these factors—from the attempted flight after the offense to causing actual injury to an officer—are present in Mr. Miller's case.

- *United States v. McGrew*, 21CR398 (BAH), McGrew engaged in multiple attacks on officers both inside the building in the Great Rotunda and outside by the "tunnel." During one interaction, he pushed and struck an officer. In another, he threw a metal pole with a large hook on the end towards a line of officers. He also filmed the officers on his phone, shouting their badges numbers and names into the recording—an indication that he was planning

something after January 6. Officers had to forcibly remove him from the capitol building. ECF. No. 24 (Government's Detention Memo). After January 6, McGrew bragged to a co-worker about what he did, displaying the video he took on his phone from inside the Capitol. *Id.* at 14. When the FBI were looking for him in April 2021, he was on probation on three different cases. When McGrew became aware that the FBI was looking for him, he "disappeared," and his mother filed a missing person's report. He then led law enforcement on a manhunt, first absconding from a sober living house that he had been court-ordered to attend and driving across the country. The FBI were unable to locate him and sought a GPS for his phone. However, McGrew left the phone associated with him in Arizona (he did not live in Arizona) and traveled to Mexico. McGrew's conduct after January 6 sets him apart from Mr. Miller in that **McGrew bragged about this conduct and when he learned that the FBI was looking for him, he fled and led the FBI on a manhunt**, showing that he was a substantial flight risk as well as a continuing danger to the community. He was also on probation for multiple offenses. None of these factors are present in Mr. Miller's case.

- *United States v. Quaglin, 21CR40(TNM).* Quaglin repeatedly assaulted officers in the tunnel, including by grabbing one officer by the neck and physically shoving and striking other officers. He also sprayed officers with bear spray. ECF. No. 8. (Government's Detention Memo). In detaining Quaglin, Chief Judge Howell found "most significant[]" his physical assault, "using his fists, a stolen riot shield, and canister of MK-9 OC spray, on no fewer than ten different officers. ECF. No. 14. (Order Denying Detention). Later on January 6 after he returned to his hotel room, Quaglin bragged about his conduct on social media, another fact Judge Howell found to be noteworthy. *Id.* at 2. Other social media evidence showed that Quaglin had prepared for the assault "months in advance" and that he collected equipment to fight, including gas masks and bear spray. *Id.* at 2. As early as November 6, he wrote about fighting in the streets of Washington, D.C., and wearing full body armor. *Id.* Quaglin's social media posts showed that he was a member of the Proud Boys and there was no evidence that he ever disassociated with them. Still, the Chief Judge found that his affiliation with the Proud Boys did not render his history and characteristics a factor that favored detention. *Id.* at 3. Instead, the Chief Judge emphasized Quaglin's extensive pre-planning and the fact after January 6 he "celebrated his role in the riot." *Id.* at 5. By contrast, Mr. Miller did not engaged in extensive pre-planning, did not brag about his conduct after the riot, and severed ties with the Proud Boys.

a. **The government's list of cases involving alleged Proud Boys and Oath Keepers are easily distinguishable; Mr. Miller is not charged with seditious conspiracy.**

The government's attempt to clump Mr. Miller in with the high-profile groups of defendants recently convicted or whose trials are underway is unavailing. For one, unlike Rhodes and Nordean, Mr. Miller is not charged with seditious conspiracy—the most serious and rarely sought charge the government has brought against January 6 defendants.[1] The Rhodes and Nordean cases are easily distinguished on that basis alone.

The government cites one additional defendant who was a Proud Boy, William Chrestman, whose detention order is published at *United States v. Chrestman*, 525 F. Supp. 3d 14 (D.D.C. Feb. 26, 2021). The following significant factors distinguish Chrestman from Mr. Miller. First, Chief Judge Howell found that Chrestman engaged in extensive pre-planning to attack and traveled to the Capitol "prepared with an axe handle, a helmet, a gas mask, and tactical gear." *Chrestman* at 27. Notwithstanding the government's attempt to characterize Mr. Miller's statements in a chat as "pre-planning," it is clear that he did not engage in planning to the extent the Chief Judge found to be noteworthy in *Chrestman*. Indeed, there are no statements attributed to Mr. Miller that suggest he was planning a concerted attack

---

[1] *See e.g.*, *Justice Department wins a conviction in a rarely used seditious conspiracy charge*, National Public Radio, November 30, 2022 (explaining that a Washington D.C. jury found a defendant guilty of a rarely used charge seditious conspiracy based on evidence that the defendant plotted to overthrow the government); available at https://www.npr.org/2022/11/30/1139848171/justice-department-wins-a-conviction-in-a-rarely-used-seditious-conspiracy-charg

with anyone.[2] At best, the statements suggest that he was merely planning to attend the rally. Second, the Chief Judge emphasized that Chrestman appeared to have destroyed the clothes and gear he wore on January 6, raising a concern that he "was trying to obstruct or conceal evidence." *Id*. at 34. As the government pointed out at the detention hearing, the clothes that Mr. Miller wore to the rally were recovered from his home two years later. Finally, and perhaps most significantly, the Chief Judge was concerned that

> nothing in the record suggests that he [Chrestman] has any remorse about the events of January 6 or *disclaimed the beliefs and gang membership animating his actions that day*, and thus there is no evidentiary basis to assume the defendant will refrain from similar activities, if instructed, in the future.

*Id*. at 34.

Standing in sharp contrast is Mr. Miller who severed his ties to the Proud Boys after January 6. Indeed, the Court now has irrefutable evidence that Mr. Miller sent a former chapter head a formal letter of resignation. While it is regrettable that he held onto the paraphernalia, Mr. Miller did not attend meetings or otherwise engage with the group, as confirmed by a former leader within the organization.

As the government acknowledges, every case is different. Counsel could parse through each case and find differences and points of comparison. That said, the cases upon which the government relies differ from Mr. Miller's in significant ways. Unlike those cases, there is no evidence that beyond the horrifying events of January 6, Mr.

---

[2] The government submitted several portions of the chat that do not include any statements or responses by Mr. Miller. These statements by other individuals do not suggest that Mr. Miller was engaged in planning a concerted attack.

Miller poses an articulable continuing threat to the public. *See United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021)(the government failed to prove by clear and convincing evidence that the defendant presented an "identified and articulable" threat to the community.).

## Conclusion

The Court has raised legitimate concerns counsel has sought to address. There is no question that Mr. Miller's prior affiliation with the Proud Boys is troubling. And it appears that the government has evidence that he assaulted officers on January 6. But the question before the Court is not whether Mr. Miller engaged in troubling conduct in the past. The question is whether the government has shown by *clear and convincing evidence* that Mr. Miller is a danger and that *no combination of conditions will ensure the safety of the community*. 18 U.S.C. § 3142(e) (emphasis added). The past two years—two years in which Mr. Miller has not publicly spoken about January 6, let alone glorified it, in which he resigned from the Proud Boys, and in which he lived peacefully in the community with his new wife—show that there are conditions that will ensure the safety of the community. Therefore, pursuant to the Bail Reform Act, this Court must release Mr. Miller with whatever conditions this Court sees fit to impose.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
ELIZABETH MULLIN

Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500