## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Action No. 1:22CR412(TSC) |
| SCOTT MILLER, | |
| Defendant. | |

## <u>MEMORANDUM IN AID OF SENTENCING</u>

Scott Miller will be before the Court for sentencing on April 19, 2024, having accepted full responsibility for his conduct at the U.S. Capitol on January 6. Mr. Miller has admitted that he assaulted officers on that terrible day. He is ashamed of his conduct. Beyond the events of January 6, Mr. Miller long ago broke ties with the Proud Boys. He disavows the group and the principles it stands for. Mr. Miller is, at his core, a gentle, kind person who lost his way after a series of setbacks. With the support of his wife, Angela, he has changed the trajectory of his life since January 6. His resolve to continue on a positive path has deepened since learning that Angela is pregnant with their first child. Mr. Miller has reflected on his conduct and has expressed his contrition in his letter to the Court and in private conversations with his family and his Pastor. *See* Letter of Angela Ware ("he had always expressed regretting his actions that day."); Letter of Pastor Andrew Brown ("Scott made me aware of his involvement in the January 6th riots on Capitol Hill and expressed

sincere remorse to me for his actions that day." ). Mr. Miller accepts his punishment for what he did that day.

That said, the Pre-Sentence Report (PSR) guideline range is excessive. For reasons explained below, Mr. Miller did not engage in more than minimal planning to assault, and therefore, a three-level enhancement under USSG § 2A2.2(b)(1) is not warranted. Moreover, Mr. Miller's conduct was brief in duration and did not result in injury to any officer. He did not enter or attempt to enter the Capitol building. Prior to January 6, he had never engaged in violent conduct. After January 6, he did not boast about or glorify his actions, nor did he attempt to minimize or justify his conduct. To the contrary, he distanced himself from the people who had influenced him to attend in the first place. Following his arrest, he perfectly complied with strict conditions of supervision. Application of the sentencing factors demonstrate that a sentence of no more than 24 months is sufficient but no greater than necessary to achieve the goals of sentencing.

## I.    Procedural History

Mr. Miller was arrested at his home in Millersville, Maryland, on December 15, 2022. He was ordered released to home incarceration with strict conditions of release following briefing by the parties on December 30, 2022. Pursuant to the release order, while Mr. Miller was under home incarceration, he could not possess any device with internet access and he could not have visitors to the home without permission. On December 21, 2022, the grand jury returned a nine count Indictment. In March 2023, Mr. Miller obtained employment. This Court permitted him to work,

on the condition that he provide his schedule to pre-trial services in advance.[1] Mr. Miller has complied with strict measures of supervision for 14 months, leaving his home only to work and to attend church services.

From the outset, Mr. Miller communicated through counsel that he wished to accept responsibility for his conduct. On October 18, 2023, he came to Court prepared for a change of plea hearing whereby he would plead pursuant to the plea agreement he ultimately entered. However, the morning of the hearing, the government notified undersigned counsel that the government would move for Mr. Miller's immediate remand following his guilty plea. Undersigned counsel acknowledged that counsel had failed to advise Mr. Miller of this provision in the plea agreement. Based on defense counsel's significant error, counsel requested a continuance of the change of plea hearing so that Mr. Miller could consider his options, including requesting a new lawyer. Yet, Mr. Miller remained steadfast in his desire to accept responsibility. Though undersigned counsel advised Mr. Miller that he would be perfectly within his rights to request new counsel and to start the plea negotiations all over again, Mr. Miller did not want to delay the inevitable. He understands that he needs to accept the consequences of his actions in order to resume his positive path with Angela and their child. Accordingly, on January 5, 2024, he accepted responsibility by pleading guilty to one count of 18 U.S.C. § 111(a)(1) and (b) (Count Two), even though he knew that he would be remanded immediately following the hearing, notwithstanding his

---

[1] Minute Order, 4/13/2023.

3

perfect compliance with exceedingly strict conditions of release. In short, Mr. Miller's acceptance of responsibility and his remorse have been unwavering.

## I.     The sentencing factors support the requested sentence.

### A. Mr. Miller's history and characteristics support a 24-month sentence.

Scott Miller was born in Baltimore to Mark and Sally Miller. He is 33 years old. His parents raised him and his younger sister in a strict, conservative home. Growing up, Scott attended public schools. In high school, he was bullied, which prompted his parents to transfer him to Granite Baptist School, a small private school with 30 kids per grade. He graduated in 2009. After high school, he attended Ann Arundel Community College, until he transferred to Liberty University. He graduated from Liberty in 2014.

After college, Scott worked for a wellness program and volunteered as a scribe at Providence Hospital. Following his work as a scribe, he worked as an EMT in Washington, D.C., where he responded to all manner of emergencies—from drug overdoses to shootings to other serious medical emergencies. Scott, who suffers from ADHD and anxiety, found that the work was too emotionally draining and stressful. Living alone in D.C. at the time, he was lonely and depressed. During this time, he came across YouTube videos of Gavin McInnes, the self-described fiscal conservative and libertarian, provocative founder of the Proud Boys. He reached out to other members of the Proud Boys, looking for a community. As he describes it, he joined the group mostly because he wanted to find a group of guys to drink and party with—

the fraternity that he never experienced in college. At first, Scott enjoyed the sense of belonging and community the group gave him.

After a couple of years serving as an EMT, Scott decided he could make a difference doing something different. For three consecutive summers, he fought wildfires in Oregon. After that, he worked installing solar panels and for a company that built pre-fabricated homes.

In 2018, Scott met his now wife, Angela Ware, through the dating application Bumble. They instantly hit it off and started dating. During the first few years of their relationship, Scott was, as Angela would describe it, "drifting." However, even as Scott was unmoored, the connection between Scott and Angela remained strong. In March 2021, the couple moved into their current home in Smithsburg, Maryland. On October 11, 2022, they married. It was the happiest day of Scott's life.

**Scott and Angela on their wedding day**:



Two months after the couple married, Scott was arrested for the instant offenses, which had occurred two years prior.

**B. Mr. Miller's assault on officers was rash and unplanned and occurred amidst a chaotic scene.**

In the days leading up to January 6, Mr. Miller talked to his friends, including other Proud Boys, about going to D.C. However, he never came up with a concrete plan to go. He did not, for example, plan to travel to the district with anyone; he did not plan to meet anyone in any particular location; and he certainly did not plan to engage in any coordinated violence. The PSR references a message chain on which Scott was copied. Notably, *there are no messages by Scott leading up to January 6.* There are no messages from him showing he was planning to go or planning to do anything there because he did not have a concrete plan to go. He certainly did not have a plan to assault anyone.

The weekend before the rally, Scott heard that some of his friends were not going, so he decided not to go. As described in both Scott and Angela's letters to the Court,[2] on January 4, Scott was driving to work (he worked in West Virginia at the time) when he hit a patch of black ice and totaled his truck. On January 5, 2021, he texted Angela about his plan to take January 6 off from work to buy a new truck:

---

[2] Exhs. 1, 6.



Scott then arranged to take January 6 off so that he could purchase a new truck. On the morning of January 6, 2021, Scott and Angela went to Pennsylvania to get the new truck. Angela had to get back to Maryland by 12:30, so she left Scott at the dealership at 10 a.m. Their plan then was to purchase the truck and have Scott drive the truck back to Maryland for the night and leave for West Virginia to continue his work week on January 7. Later that morning, at 10:51 a.m., Scott texted Angela about the truck. Notably, there is no mention of a plan to attend the Stop the Steal rally:



When he returned home, Scott saw what was going on at the Capitol on the news. He wanted to be a part of it. So, he told Angela that he had changed his mind and was going to go to D.C. He drove to D.C. by himself and made no plan to meet up with anyone. He did not bring any weapons with him, though he was a lawful gun owner. He brought goggles because he heard there might be tear gas. The gloves he had were not "tactical" gloves as the government suggests—they were motorcycle gloves he routinely wore during winter months. By the time Scott arrived on the grounds at approximately 3:30-4:00 p.m., the crowd had already entered the Capitol and chaos had broken out on the West Terrace. Mr. Miller admits that as soon as he arrived, he joined the crowd, physically and emotionally.

### i. *Mr. Miller came to the aid of an injured protestor.*

When Scott positioned himself at the mouth of the tunnel, he saw a woman fall to the ground, clearly in physical distress. He rushed to her aid, assisting to cut off her jacket while another protestor attempted to give her CPR. He later learned that the woman was Rosanne Boyland and she died, very likely, at the time that he was attempting to come to her aid. Screenshots capturing Mr. Miller administering aid to Ms. Boyland is below. Counsel will submit the video to chambers.[3]





*Screen shots of Mr. Miller coming to the aid of woman later identified as Ms. Boyland.*

---

[3] The time stamp on the screen shot is incorrect; a review of the relevant footage shows that Mr. Miller came to Ms. Boyland's aid at 4:29 p.m. Ms. Boyland is reported to have died between 4:26-4:29 p.m. News of her death circulated across the West Terrace by 4:40 p.m.

When it became clear that Ms. Boyland could not be resuscitated, other protestors attempted to lift her into the tunnel. At this point, frustrated and under extreme stress, Mr. Miller struck towards officers with items he found there—a pliable plastic pole and a shorter wooden baton—aiming towards the tunnel in an effort to clear a path. He also struggled with officers at the mouth of the tunnel. After a few minutes, he decided to leave the Capitol area.

Mr. Miller does not claim that his conduct was justified or righteous. He was wrong and he has accepted responsibility for his conduct through his plea and in private conversations with Angela, his parents, and his Pastor. That said, counsel respectfully directs the Court's attention to his attempts to aid Ms. Boyland in the moments before his struggle with officers to provide context for his actions.

### ii.  *Mr. Miller's remorse was immediate*.

Unlike many January 6 defendants, Mr. Miller did not publicly or privately glorify what happened on January 6. Instead, he returned home to Angela and processed what had happened. He immediately understood that what he did was wrong. As Angela describes in her letter, he slowly started to change. For one, he understood what Angela had been telling him all along—that the Proud Boys were a bad influence him. While it all started as a party group of loosely affiliated young men, from Scott's perspective, the group had become more political and emboldened after President Trump famously told the group to "stand back and stand by" during

the first presidential debate.[4] After the debate, Scott noticed suddenly new people wanted to join, and the rhetoric and meetings became more aggressive.

In February 2021, Scott formally resigned from the group by way of a resignation letter.[5] Notably, he resigned almost two years before he was charged. In his letter to the Court, he writes, "I disavow the group and I regret the influence it had on my life."[6]

After severing ties with the Proud Boys, Scott settled into domestic life with Angela, who was relieved he had finally left the group. The couple began attending church services at the nearby Mount Bethel United Methodist Church. Scott began working with the Pastor so that he could become a more active member in the church. Pastor Brown writes that in talking with Scott, he "witnessed a change in him over the past year" and that "Scott has not shied away from being honest about what he has done."[7] Following his arrest, Scott took advantage of the therapy provided through pre-trial services. On April 1, 2023, his therapist noted, "client appears open and honest. Seems to be working to change his mindset."[8]

---

[4] Andrew Nagourney, *Watch 4 Key Moments from Trump at the First 2020 Debate*, N.Y. Times, (Sept. 30, 2020), https://www.nytimes.com/2020/09/30/us/politics/trump-debate-video.html.

[5] Counsel located the Chapter head of the group, who wished to remain anonymous. In an email to counsel, he confirmed that Mr. Miller resigned from the group. *See* Exh. 2.

[6] Letter of Scott Miller, Exh. 7

[7] Letter of Pastor Brown, attached hereto as part of Exhibit 1.

[8] Catoctin Counseling Quarterly Treatment Plan Report, attached as Exh.3.

**C.  Mr. Miller's offense of conviction (assault) did not involve "more than minimal planning." Therefore, a two-level enhancement under USSG § 2A2.2(b)(1) does not apply**.

Scott never had an elaborate plan to go to the Stop the Steal rally. Instead, he was a passive member of a "text chain" in which members of the group were discussing going. Notably, on the days leading up to January 6, he did not send any text messages indicating that he was planning to go. Nor did he send any messages indicating that he was planning to assault anyone. This is because he never made a concrete plan to go and certainly did not have a plan to assault. As described in his wife, Angela's, letter[9], the weekend prior to the rally, Scott had decided not to attend the rally. On January 4, 2024, he spun out on ice and totaled his truck. Because he worked in West Virginia, he came back to Maryland and arranged to buy a new truck on January 6. On January 5, he exchanged text messages with Angela, which show he was planning on buying a truck on January 6. On January 6, Scott let Angela know he got the truck and was on his way home. As promised in his text message to Angela, Scott returned home around 1:30. While eating lunch, he saw what was going on at the Capitol on the news and online. He decided then that he wanted to be a part of it (a decision he will regret for the rest of the life) and told Angela he was going to go after all. When he left to go, he did not bring any weapons. He only brought a pair of goggles because he anticipated there might be tear gas at the rally.

Once Scott arrived at the Capitol, he did not meet up with anyone or coordinate any assaults with anyone. His conduct was rash and reckless, *but it was not planned.*

---

[9] Angela Ware's letter is attached as part of Exhibit 1.

Regrettably, like so many others there that day, he became carried away by the frenzy of the crowd, which had been whipped into a fervor by Mr. Trump and the other rally speakers.

The PSR is wrong that Scott's conduct involved "more than minimal planning," warranting a two-level increase under USSG § 2A2.2(b)(1). For purposes of the guideline, "more than minimal planning" is defined as

> more planning than is typical for commission of the offense in a simple form. 'More than minimal planning' also exists if significant affirmative steps were taken to conceal the offense, other than conduct to which §3C1.1 (Obstructing or Impeding the Administration of Justice) applies. For example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimal planning. By contrast, luring the victim to a specific location or wearing a ski mask to prevent identification would constitute more than minimal planning.

Cmt. 2.

Scott's offense does not meet the definition of more than minimal planning in any respect. He did not engage in any planning more than that required for the commission of the offense, which is assault. Other assault cases in which the enhancement was approved are instructive here. In *United States v. Foster*, 898 F.2d 25 (4th Cir. 1990) the Fourth Circuit affirmed the more than minimal planning enhancement where the defendant, after catching his partner in bed with another man, took the following steps:

> Foster then took a metal gas can off [his girlfriend's] porch and drove to a convenience store where he purchased a gallon of gasoline and an electrical extension cord. Foster returned to the []residence where he cut the ends off of the extension cord and stripped some of the cord to expose bare wires at both ends. Under cover of night, Foster attached two of the wires at one end to two spark plugs in [victim]Brown's car. Foster next splashed gasoline around the back seat of the interior of Brown's car.

> Foster connected the two wires at the other end and placed them in the
> gasoline remaining in the can.

*Foster* at 26. The Fourth Circuit, noting that the defendant took multiple steps to make a bomb and then hid the bomb under a pile of clothes in the victim's car, found the offense involved more than minimal planning for purposes of USSG § 2A2.2(b)(1). In another case involving assaultive conduct, the Fourth Circuit affirmed the application of the enhancement were the defendant, a detainee in a local jail, "mixed a solution of baby oil, hand lotion, and water in a cup and heated it in a microwave" and threw the mixture in another detainee's face. *United States v. Hashi*, 318 Fed. Appx. 241 at 243 (4th Cir. 2009).

Mr. Miller's offense did not involve any of the planning steps that the courts found persuasive in *Foster* and *Hashi*. He did not have a concrete pre-plan to attend the rally with a specific plan to assault anyone, he did not coordinate a meet-up with anyone in order to engage in assault, he did not bring weapons with him when he did decide to go, and he did not engage in any conduct to conceal his actions.

Finally, even if the Court finds that Mr. Miller planned to go to the rally (as did thousands of Americans), *planning to go to the rally is not planning to commit an assault*—which is his offense of conviction. Indeed, there is absolutely no evidence in the record that he pre-planned to assault officers. He did not bring any weapons, nor did he text message anyone about any assault. *C.f. United States v. Marshall Neefe*, 21-CR-567 (RCL) (minimal planning enhancement not applied where defendant prepared a specific weapon—a "commie beater"—to bring to the Stop the Steal rally).

For all the reasons above, the two-level enhancement under USSG § 2A2.2(b)(1) does not apply.

**D. The applicable sentencing enhancements for dangerous weapon and conviction under 111(b) and assault on an officer effectively result in double counting and over-represent the severity of the conduct, justifying a downward variance under 18 U.S.C. 3553(a).**

Sentencing courts have broad discretion to vary from the sentencing guidelines and may do so based on policy considerations, including disagreements with the guidelines. *See United States v. Booker*, 543 U.S. 220, 244 (2005). In this case, the applicable guidelines to the conduct underlying the assault against officers in violation of 18 U.S.C. § 111(a)(1) and (b) create an unreasonably harsh sentence. While Mr. Miller does not object to the applications of the enhancements and base offense level agreed to in the plea agreement, the Court should vary downward because application of these enhancements and the resulting guideline range in this case over-represents the seriousness of Mr. Miller's conduct. 18 U.S.C. § 3553(a)(1). Additionally, the guidelines' arbitrary application of USSG § 2A2.2 for aggravated assault against an officer and USSG § 2A2.4 for simple assault against an officer creates dramatic sentencing disparities for the exact same conduct.

**i. Mr. Miller's base offense level is elevated under 2A2.2.**

Under the terms of the plea agreement, Mr. Miller agreed that USSG § 2A2.2 applied because he assaulted officers with an intent to commit another felony (civil disorder). Therefore, he began at an elevated base offense level of 14 because the conduct amounted to an "aggravated assault." Aggravated assault as defined by the sentencing guidelines in pertinent part means that the conduct constituted "a

15

felonious assault with intent to commit another felony." USSG § 2A2.2, Application Note 1. Here the "other felony" is a civil disorder. In contrast and for context, simple assault of an officer under 18 U.S.C.§ 111(a), which does not involve conduct resulting in serious bodily injury or a dangerous weapon with intent to injure, starts at a base offense level of 10 under USSG § 2A2.4. Thus, application of USSG § 2A2.2 targets the fact that the assault involved an intent to commit another felony, which, in this case, is impeding the function of police officers.

ii.   **The applicable sentencing enhancements for use of a dangerous weapon and conviction under 18 U.S.C. § 111(b) results in double counting and over-represents the severity of the conduct**.

Mr. Miller's use of a wooden stick is used twice to trigger an unreasonably high total offense level—first, because he receives a four-level enhancement under USSG § 2A2.2(b)(2), and second, because he receives another two-level enhancement for having been convicted under 18 U.S.C. § 111(b), resulting in a total increase of six levels. As the Court is surely aware, many January 6 defendants—including defendants convicted of using a hockey stick and pyrotechnic devices as weapons— were convicted under 18 U.S.C. § 111(a) and *did no*t receive the two-level increase under 2A2.2(b)(7). But because Mr. Miller was convicted under § 111(b), he receives a two-level offense increase for the same, if not less, severe conduct. In other words, he arbitrarily receives a two-level increase because the government would not permit him to plead guilty to § 111(a). The Court should consider this arbitrary increase to the offense level and vary downward under the 3553(a) factors.

### iii. The official victim enhancement—on top of the six-level increase for use of a dangerous weapon (a wooden stick)—adds another six-level enhancement resulting in a guideline range which overstates the severity of the conduct.

On top of the six levels for dangerous weapon, Mr. Miller agreed to an additional six-level upward adjustment under USSG § 3A1.2(c)(1), Official Victim. Section 3A1.2(c)(1) permits an upward adjustment for conduct that creates "a substantial risk of serious bodily injury" to a law enforcement officer that the defendant knew or had reasonable cause to believe was a law enforcement officer. Notably, § 111 specifically targets conduct against officers or employees of the United States while they are engaged in, or on account of, the performance of their official duties, *see* 18 U.S.C. § 111, and Mr. Miller receives a two-level increase for having been convicted under § 111(b). Thus, application of the Official Victim adjustment increases Mr. Miller's base offense level by six levels, even though three prior enhancements already target and punish the same conduct—that a dangerous weapon was used towards an officer with intent to commit a civil disorder while s/he was engaged in the performance of his or her official duties. With this final adjustment, Mr. Miller's total offense level rises from 19 to 23—increasing the guideline range from 30-37 months to 46-57 months. Accordingly, application of three enhancements—for use of a dangerous weapon, conviction under 111(b), and the official victim adjustment—results in enhancements that rely on the same three facts in multiple, redundant ways. Specifically,

- The base offense level is 14 because the conduct involved a felonious assault that involved a dangerous weapon with an intent to commit civil disorder. USSG § 2A2.2.

- Four levels are added because a dangerous weapon was used. USSG § 2A2.2(b)(2)(B).

- Two levels are added because in assaulting an office engaged in performance of official duties, Mr. Miller used a dangerous weapon. USSG § 2A2.2 (b)(7).

- Six levels were added because Mr. Miller "create[ed] a substantial risk of serious bodily injury" to a "law enforcement officer." USSG § 3A1.2(c)(1).

By way of illustration, if 2A2.4 applied, Mr. Miller's guideline range would be 10 to 16 months. But because he admits that he acted with the intent to commit another felony (civil disorder), his guideline range jumps to 46 to 57 months. Because the enhancements rely on the same fact to justify multiple, significant enhancements, this Court should find that the resulting guideline range is overly harsh and over-represents Mr. Miller's conduct. Accordingly, a downward variance to 24 months is warranted.

### E. A sentence below what the government is seeking would avoid unwarranted disparities.

A sentence below what the government has requested will promote respect for the law and avoid unwarranted disparity. Similarly situated January 6 cases have received considerably less than what the government has requested in most, but not all, cases. A sampling of the most serious cases with similar, albeit less culpable, conduct follows:

- *United States v. David Blair*, 21-cr-186 (PLF): Blair, who carried a large confederate flag and a backpack containing a knife and duct tape, and pushed a large lacrosse stick against a police officer's chest while yelling

that he would not submit to commands, pleaded guilty to civil disorder (231) and was sentenced to five months.[10]

- *United States v. Devlyn Thompson*, 21-cr-461 (RCL): Thompson pleaded guilty to assault (111(b)) after exhorting officers to fight one-on-one, passing out riot shields to rioters and encouraging them to use the shields as weapons against the officers, spraying bear spray at officers, throwing a large box speaker at the police line, assaulting a police officer with a metal police baton, and remaining in the tunnel for more than 13 minutes.[11] He was among the first of the rioters to arrive on the inaugural stage, and he was one of the last to leave. For these numerous assaults over an extended period, he was sentenced to 46 months.

- *United States v. Marshall Neefe, 21-CR-567 (RCL):* Neefe pleaded guilty to obstruction of justice and assault (111)(a) after coordinating and planning for weeks ahead to travel to D.C. to violently ensure that President Trump would stay in power. As part of the plan, Neefe fabricated a wooden club—which he named the "Commie Knocker"— that he carried to Capitol grounds. At the Capitol, he participated with others to thrust a large metal sign into a line of law enforcement. Once he broke the line, he entered the Capitol building and spent 40 minutes

---

[10] *United States v. David Blair*, 1:21CR186 (PLF), ECF. No. 55, Government's Sentencing Memorandum.

[11] *Unites States v. Devlyn Thompson*, 1:21CR461 (RCL), ECF. No. 10, Statement of Offense.

inside. After January 6, through Facebook, he expressed pride about getting tear gassed and breaching the Capitol. At his sentencing, the government identified three police officer victims of his assault.[12] For all of this, he did not receive the more than minimal planning enhancement (despite having created a weapon solely for the purpose of bringing to D.C.) and was sentenced to 41 months.

- *United States v. Alan Byerly* 21-cr-257 (RDM): Byerly was charged with assault (111(b)) for assaulting several officers with a taser, but pleaded guilty to assault (111(a)) and striking another person (113) for assaulting a reporter. According to the government, Byerly engaged in three separate assaults—he activated a stun gun on one police officer and, when it was taken by officers, he physically struck them and pushed against them, grabbing an officer's baton; he assaulted a group of officers using an enormous, all-metal Trump billboard with sharp edges that was capable of splitting someone's head open as a battering ram; and he viciously assaulted a member of the press, dragging him up and down the staircase. As the government described it, "Byerly grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and towards a dense crowd.

---

[12] *United States v. Marshall Neefe*, 1:21CR567 (RCL), ECF. No. 84, Government's Sentencing Memorandum.

Byerly eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below." For all of this, Byerly was sentenced to 34 months.[13]

- *United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers before entering the Capitol. After January 6, he deleted Facebook messages and videos.[14] At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting officers with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months.

- *United States v. David Judd,* 21-cr-40 (TNM): Judd was found guilty after a stipulated trial of obstruction (1512) and assault (111(a)). According to the government, Judd was fully aware of the certification

---

[13] *United States v. Alan Byerly*, 1:21CR257 (RDM), ECF. No. 46, Government's Sentencing Memorandum.
[14] *United States v. Ricky Wilden,* 1:21CR423 (RC), ECF. No. 36, Government's Sentencing Memorandum.

process, intended to disrupt the activities of Congress before coming to D.C., and "acted as an on-the-ground commander of other rioters, directing, encouraging, and instigating the violence, chaos, and destruction in and around the tunnel . . . yelling commands to organize rioters, passing items into the tunnel to be used as weapons."[15] He then joined in coordinated pushes against the police line and lit a pyrotechnic device and threw it at the police line.[16] The government characterized his conduct as "some of the most aggravating conduct that we've seen on January 6th."[17] Judd received the dangerous weapon enhancement and the Court found that Judd intended to cause bodily injury by throwing the firecracker, but the Court disagreed with the guideline range of 78 to 97 months proposed by the government and probation and found a range of 37 to 46 months and then varied downward to impose a sentence of 32 months, finding the "advisory guideline produces an advisory sentence that is overly harsh."[18]

---

[15] *United States v. David Lee Judd*, 1:21CR40 (TNM), ECF. No. 527, Government's Sentencing Memorandum.

[16] *Id*.

[17] Sentencing Hearing Transcript at p. 17; *See also*, Tr. at 26 (seeking a terrorism enhancement, the government represented "the degree of his conduct was so great, and his intent there was so great, coupled with all of his other actions in the tunnel, which include directing the rioters, passing the shields in, passing the crutch in, telling people were to go, engaging in the heave-ho himself, this Defendant did it all, and he did it over the course of a long period of time."); Tr. at 53 ("looking at all of the January 6 rioters, I think this Defendant is at the high end of them also.")

[18] The Court found the guideline range to be lower because it did not apply the 2J1.2 "administration of justice" enhancements, later found to by the D.C. Circuit to be inapplicable in *United States v. Brock*.

- *United States v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111(a)) and obstruction (1512) after he threw beer cans and batteries at officers and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them, causing at least six officers to experience "smoke" or "unknown fog." One officer said the "smoke" impaired his vision; another said it burned his skin. For all of this, Miller was sentenced to 33 months.[19]

- *United States v. Clifford Mackrell,* 21-cr-276 (CKK): According to the government, Mackrell traveled to the rally "outfitted for battle" wearing gas masks and heavy gloves. Mackrell admitted to multiple assaults, including striking and pushing officers and pulling at an officer's gas mask. One officer victim testified at the sentencing hearing that Mackrell stuck his finger in his eye. Mackrell also admitted to using plywood to push against officers who were trying protect the Capitol.[20] For these multiple assaults, Mackrell received a sentence of 27 months.

These cases demonstrate that the sentence requested by the government is greater than necessary. Comparing Mr. Miller's behavior to the panoply of January 6 defendants, his conduct was certainly more serious than many who wandered through the Capitol, but is less serious than those who brought weapons with them and caused injury to officers. He also stands apart from many January 6 defendants

---

[19] 1:21CR75 (RDM), ECF. No. 67, Government's Sentencing Memorandum.
[20] 1:21CR276 (CKK), ECF. No. 101, Government's Sentencing Memorandum.

in that he did not glorify or minimize his conduct after the fact. Instead, he resigned from the Proud Boys, whose influence had taken him away from his core values, and accepted full responsibility for his conduct, not only before the Court, but with his wife and Pastor.

**F. The requested sentence will achieve the goals of sentencing.**

Mr. Miller has been under the strictest terms of home incarceration for over one year with perfect compliance. When he is released from his sentence, he will continue on supervision. He lost his job due to his arrest in this case. He will miss the birth of first child and the baby's critical developmental milestones. And for the rest of his life, he will be hampered by a felony conviction. Mr. Miller knows he brought this cascade of consequences onto himself. However, a lengthy prison sentence exceeds what is needed to achieve the goals of sentencing.

As for deterrence, Mr. Miller's track record on release and his public disassociation with the Proud Boys show that a prison sentence is not needed to deter him from re-offending. As for general deterrence, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[21] In short, there is little empirical support for the prospect that a

---

[21] Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); *see also* National Institute of Justice, *Five Things About Deterrence*, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment");

period of confinement will be any more effective at deterring Mr. Miller or others from committing similar offenses.

The consequences that Mr. Miller has already experienced and will continue to experience are severe and should be considered by this Court in assessing what would constitute a "just punishment." Though he has achieved rehabilitation, he knows he has to serve time and knew that when he agreed to plead guilty. During this time, he will not be able to work to contribute to his young family. He will have to wait to meet his first-born child. He will be away from his anchor, Angela. As this Court appreciates, every day, every hour locked away in prison is a punishment. No more than 24 months in prison followed by supervision is needed to achieve the goals of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

---

Ellen Raaijmakers *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. OF RSCH. IN CRIME AND DELINQ. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 CRIME & JUST. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay*, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Elizabeth Mullin
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Elizabeth_Mullin@fd.org