UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 22-CR-412 (TSC) |
| SCOTT MILLER, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Scott Miller to 71 months of imprisonment, three years of supervised release, a $100 special assessment and order him to pay restitution in the amount of $2,000 for his conviction for assaulting a police officer with a dangerous or deadly weapon on January 6, 2021. The recommended sentence, which is at the top of the applicable Guidelines range, is warranted by Miller's pre-planning and coordination with other Proud Boys to attack the Capitol, his vicious and repeated attacks on police officers at the Lower West Terrace tunnel, his history and affinity for violence, and the need to deter Miller and others from future political violence.

## I.    INTRODUCTION

Miller, one of the leaders of the Maryland/D.C. Chapter of the Proud Boys, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and

resulted in more than 2.9 million dollars in losses.[1]

In the lead-up to January 6, Miller and his fellow Proud Boys members expressed outrage at election results and prepared for violence on January 6. They discussed what to wear, how to obtain tactical gear, the possibility of using violence, and the need to destroy evidence to evade detection after January 6. On the day itself, members of the chat discussed efforts to get inside the Capitol Building. Consistent with his discussions with other Proud Boys, Miller arrived at the Capitol on January 6 ready to fight, wearing neon orange ski goggles and gloves with plastic knuckles. He made his way through the dense crowd to the Lower West Terrace "tunnel" where dozens of police officers defended an entrance to the Capitol Building. Over the course of approximately twenty minutes, as part of the rioters' violent efforts to get into the Building, Miller waged at least seven separate attacks on the police at the tunnel. He threw dangerous objects at the police, including a metal pipe or pole, a bottle, a stick, and a large speaker. He repeatedly hit officers with poles, including one officer who was struck multiple times as she tried to defend the tunnel. As part of the effort to disarm the police and storm the building, Miller ripped a shield out of officers' hands and handed it to another rioter.

The government recommends that the Court sentence Miller to 71 months of incarceration.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

A sentence of 71 months in prison accounts for the numerous aggravating factors present in this case, including Miller's history and affinity for violence, his preparation to commit crimes on January 6, his violent assaults of multiple police officers, and the significant need for deterrence.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 47, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").   The entrance usually consists of a flight of stairs leading to a doorway.   On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that

was approximately 15 feet long.   That tunnel led to two sets of metal swinging doors inset with glass.   On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.   The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.   Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance.   Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 PM, the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.   Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.   At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

4

> So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.   That's about from the distance where I'm sitting here on the dais to that back wall.   And from that office in close proximity to where you all held the line, I listened to you struggle.   I listened to you yelling out to one another.   I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.   And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.   Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle.

> We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 pm.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.   It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**C.      Miller's Role in the January 6, 2021 Attack on the Capitol**

Before January 6, 2021, Miller coordinated with other members of the Maryland/D.C. Chapter of the Proud Boys. On that day, prepared with ski goggles and gloves with plastic knuckles, Miller attacked numerous police officers defending the entrance to the Capitol Building on the Lower West Terrace. Additionally, at the time of his arrest, law enforcement located numerous items in his residence indicating an affinity for violence.

*i.      Miller's Group Chat with Other Proud Boys*

In the days and weeks leading up to January 6, Miller participated in a group chat with other members of the Maryland/D.C. Chapter of the Proud Boys.[2] Specifically, Miller was one of multiple individuals on a group chat called "Cleared for Entry" on an encrypted messaging application. The "Cleared for Entry" chat was one of the steps in the recruitment process for new Proud Boys members in the Maryland/D.C. Chapter and was made up of Chapter leaders and new initiates. Miller was a member of the group by virtue of being one of the Maryland/D.C. Chapter's leaders.[3]

Beginning in late December, members of the group chat began to discuss their plans for January 6. For example, on December 19, 2020, another member of the Proud Boys reported in the chat, "Trump has put Special Forces under civilian control......get ready." A discussion of an

---

[2] The group chat was recovered from the phone of another member of the chat during the investigation. The group chat was not on Miller's phone when the phone was seized and searched by law enforcement.

[3] Miller held the position of "Consul Legate," which, according to documentation located in his home is an "advising role to leadership" which endows "authority during meetings, events, and rallies," including the authority to issue "gear up" orders.

imminent violent coup ensued. One member told the group, "Dont pray, load!" Another member warned, "Intel agencies, federal LE, DOJ aren't protecting the interests..." Another said, "I've heard officer generals and career folk are the enemies of the ppl or the American way." Another member asked, "Think they can push this coup until after the first of the year so I have time to get my new toy sighted in?" Later that day, after Donald Trump tweeted plans for a "wild" protest in D.C. on January 6 ("Big protest in D.C. on January 6. Be there, will be wild!"), one member of the chat noted that the "wild" protest would take place "[t]he day Senate confirms election."

On December 22, members also discussed obtaining tactical gear for January 6. For example, one member messaged, "Cool so just to clarify, suit up January 6th and dress down January 20th." Another member asked, "…is there a website to get gear from?" When someone asked what kind of gear he wanted, he responded, "Whatever to protect my a** from a knife lol [laugh out loud]." A member responded with the name of a website. When asked what gear the member would recommend, he responded, "Most of their stuff is good and the prices are competitive. I just bought the Legacy MICH Levell IIIA Ballistic Helmet." He then said, "If you're going down on the 6th let me know, I may have something you can use."

On December 29, a member sent a message that a DC hotel was closing on January 4, 5, and 6. Another member stated, "Pushing PB [Proud Boys] out of the city. No place to stay means they leave before night fall. Gives Antifa free reign." Miller responded, "Lol [laugh out loud] that's what they think." He followed up with the message, "dress warm and bring liquor. Problem solved."

On January 2, the chat turned to talk of violence. One member encouraged others to "dispense justice" and not be afraid to fight. Another member observed, "Police are tear gassing and beating trump supporters now I have a feeling Jan 6 will be a fight immediately." Another member responded, "We have to totally overwhelm them. Dont be affraid of jail......you will be a prisoner to tyrannts if you dont and will be enslaved forever. If the police try this shit it is our CONSTITUTIONAL duty to take them out." He explained, "We will flank and envelop them and they WILL run," and "If they push it … then we go hot." He urged the members to "Be brave. Your forebearers brought you freedom at a heavy cost…what will you do for generations to come?" and warned "we are one step closer to civil war." Another agreed: "I knew it only matter of time before cops turn on citizens."

On January 4, one of the members issued instructions for January 6, stating, "I'm going to assume we all know the thing kicks off at the ellipse at 11 and the march will be to the capitol building." He went on to caution, "Comms will be a problem and we don't have radios … be prepared to be out of contact." "Try not to get separated," he went on, "this event is going to be super heated both sides have had enough… don't want my boys caught alone……plan for the worst hope for the best…. Get in your heads that the left is attempting to take your country from you…. This is not a party, savvy? It could explode at any moment….."

Later that day, Proud Boys chairman Enrique Tarrio was arrested in Washington, D.C, for his December 12 burning of a "#BLACKLIVESMATTER" banner that had been stolen from a Washington, D.C. church. He was detained briefly, and upon his release on January 5, was ordered to leave the District of Columbia. The Maryland/D.C. Proud Boys encrypted messaging group

erupted in anger and talk of violence against the police and Antifa. Some members openly advocated for fighting and "blow[ing] up dc police hq phone lines" saying, "Ok, real shit.. we are not holding back," "I'm going for blood now," "Now I'm in fking battle mode, that Enrique shit, nah, fk you ... die slow."

On January 5, the members of the chat discussed preparations to travel and stay in Washington D.C., including the provision of hotel rooms. In response to this discussion, Miller messaged, "Good deal, be SUPER INCOGNITO when you're going in/out of your hotel. Last time we were in DC some of our guys got barricaded in theirs by MPD bcus antifa swarmed the place when they found out pbs were there." One member sent "directives" to the group, which included: "Don't bunch up and march together as Proud Boys. They'll pick everyone out and know exactly who/where you are at all times. Instead permeate the crowd."; "Once word comes down about the electoral votes, the normies will make a stink. Make a stink with them."; and "If unrest begins, go with the flow. Let the normies wake up America. Show them the PEOPLE are pissed. Not just the PBs." Once conflict began, he continued, the Proud Boys had license to fight: "If shit goes hot let your hands go. Finish your business."

<em>ii.    Miller's Attacks on Police at the Lower West Terrace Tunnel</em>

On the morning of January 6, 2021, Miller drove from his home in Maryland to Elizabethtown, Pennsylvania where he bought a used pickup truck. From Elizabethtown, Miller drove the new truck home to Millersville, Maryland. Miller claims that after he arrived home at approximately 1:30 p.m., he had lunch, during which time he saw what was happening at the U.S. Capitol on the news. Miller then got back in his new truck and drove to Washington, D.C. to join

his fellow Proud Boys members as planned. Throughout the day on January 6, members of the chat updated the group about their whereabouts and activities. For example, at approximately 2:23 p.m., members of the group messaged that they had entered the U.S. Capitol Building, stating "We're in!" and "MFERS ARE INSIDE" and "We have breached the Capital Capital whoohoo go boyzzz." According to location data from his cell phone, Miller arrived at the Capitol at approximately 3:00 p.m.

By approximately 4:15 p.m., Miller had made his way up to the Lower West Terrace tunnel and joined the crowd fighting against the police. As depicted below, Miller wore a bulky tan jacket, black gloves with plastic knuckles, a red and black neck gaiter, orange ski goggles and a tan military-style backpack. As pictured below, Miller's torso in the bulky tan jacket appeared to have an unnatural and distinctive crease or bulge, suggesting he may have also been wearing body armor or a plated vest underneath the jacket, like the one later found in his home.



*Image 1: Still Image from Exhibit A at Timestamp 00:04 of Miller near the Lower West Terrace Tunnel*

11

Miller initially appeared on the tunnel's CCTV camera at approximately 4:16 p.m. At this time a very large and dense crowd had formed on the Inaugural Stage, with dozens of rioters squeezed into the tunnel and pushing against the police line. Miller, as depicted below, pushed his way through the crowd and immediately began to push against the rioters in front of him in a collective effort to apply immense pressure against the police line.



*Image 2: Still image from Exhibit B at Timestamp 4:16:51 p.m.*

Miller continued to push his way into the tunnel and to push against other rioters and the police for approximately five minutes before the police in the tunnel successfully pushed Miller and the other rioters back to the mouth of the tunnel.

At approximately 4:27 p.m., Miller came back to the police line at the tunnel. Police officers were then located at the entryway under the arch. Miller picked up a long pole from the ground, charged toward the line of officers at the entryway to the tunnel and swung it repeatedly

at MPD Officer L.M., several times, striking her on her body, head, and helmet with the pole while
she attempted to hold the police line at the mouth of the tunnel.



*Image 3: Still Image from Exhibit C at Timestamp 16:27:57 of Miller Striking Officer L.M.*



*Image 4: Still Image from Exhibit A at Timestamp 00:18 of Miller Striking Officer L.M. in the Head*

After striking Officer L.M. with the pole, Miller moved back into the crowd of rioters. At approximately 4:32 p.m., he once again approached the police line at the tunnel. This time, as the police tried to stop the crowd from attacking them, Miller picked up and threw at least four objects at the police, including a bottle, a stick, a large black speaker, and an article of clothing.



*Image 5: Still Image from Exhibit D at Timestamp 00:01 of Miller Throwing a Bottle*



*Image 6: Still Image from Exhibit D at Timestamp 00:10 of Miller Throwing a Stick*



*Image 7: Still Image from Exhibit D at Timestamp 00:23 of Miller Throwing a Speaker*



*Image 8: Still Image from Exhibit D at Timestamp 00:34 of Miller Throwing Clothing*

After throwing these objects at the police, Miller then found another long pole and, as rioters near the police line pushed up against the riot shields held by officers, again attacked the police with it, jabbing and striking at their helmets and heads multiple times in quick succession.

16

As depicted in Exhibits E and F below, Miller struck at least two officers a total of at least seven times with the blue pole.



*Image 9: Still Image from Exhibit E at Timestamp 4:33:34 of Miller Striking Officers with the Blue Pole*



*Image 10: Still Image from Exhibit F at Timestamp 00:26 of Miller Striking Officers with the Blue Pole*

Moments later, Miller again charged the police line at the mouth of the tunnel. This time,

he grabbed the edge of a shield held by Officers M.D. and J.S. and, along with other rioters,

forcefully ripped the shield out of the officers' hands. After stealing the shield, Miller pulled it

down into the crowd and handed it off to other rioters.



*Image 11: Still Image from Exhibit G at Timestamp 16:33:39 of Miller's Gloved Hand Grasping the Shield*



*Image 12: Still Image from Exhibit H at Timestamp 00:04 of Miller Pulling the Officers' Shield Into the Crowd*

In addition to his multiple attacks on the police at the tunnel, Miller also damaged property while at the Lower West Terrace. Specifically, Miller repeatedly struck a pane of glass in a window frame near the tunnel with an unknown object or tool.



*Image 13: Still Image from Exhibit I at Timestamp 00:09 Showing Miller with an Item in his Hand After Striking the Window Multiple Times*

Other panes of glass in the same window had already been broken and rioters were climbing in and out of the broken window and handing objects from inside the building out to the crowd through the broken glass. Many of these objects were used by members of the mob to attack the police officers in the tunnel.

Later that evening, the Proud Boys in the chat discussed destroying the social media

evidence linking them to the riot. One participant said at approximately 8:56 p.m. "Yo real quick im just putting it out there I will be nuking this group tomorrow and sticking you all in a different one." When another member questioned deleting the chat, the member responded "Lol [laugh out loud] no hate we are just scrubbing our records." The last message in the "Cleared for Entry" group chat was sent by Miller at approximately 9:28 p.m. on January 6. Miller commented on the fact that a member of the chat had been arrested, stating, "Damn he was just on the chat." From at least one item found on Miller's cell phone, it appears the chat was reformed after January 6, 2021 and that Miller had access to it. *See* Exhibit J (filed under seal), Item 36.

### iii.   *The Search of Miller's Residence*

In December 2022, law enforcement executed a search warrant on Miller's residence in Millersville, Maryland. During the search, law enforcement recovered black gloves with plastic knuckles that appear to be the gloves he wore on January 6th.



*Image 14: Photograph of Gloves Recovered from Miller's Home*

Law enforcement also located four guns, hundreds of rounds of ammunition, armor plates,

a tactical vest with pockets for insertion of the plates,[4] and a mat showing blueprints for assembling an assault rifle.



*Image 15: Photograph of Firearm Parts and A-R Assembly Directions at Miller's Home*

Law enforcement also recovered items indicating Miller's membership in the Proud Boys organization, including Proud Boys patches, insignia clothing, and bumper stickers and a document indicating Miller held a leadership role in the Proud Boys.   Some of these items had the slogan, "We Are Watching." Agents also recovered items with Nazi insignia, including a patch featuring the slogan of the Schuttzstaffel, or SS, a major paramilitary organization under Hitler.

---

[4] The size and shape of the tactical vest and armor plates are consistent with the visible bulk underneath Miller's large tan jacket on January 6.



*Image 16: Photograph of Patches Bearing SS Slogan Found in Miller's Home*

Inside Miller's closet was a shirt bearing the words "Minneapolis Police" and "CHAUVIN," a reference to the police officer who has been convicted of the murder of George Floyd in the summer of 2020.



*Image 17: Photograph of Shirt Located at Miller's Residence*

22

Miller wore the shirt as a Halloween costume, as shown by a photograph found on his cellular phone.



*Image 18: Photograph of Miller from Miller's Cellular Phone Taken November 1, 2020*

Also on Miller's cellular phone were numerous memes and images promoting racially motivated violence. Other photographs showed Miller's continued membership in the Proud Boys for several months after January 6. One photograph shows Miller posing and smiling next to a news story describing the drowning of migrants. A screenshot dated January 6, 2021 at 11:34 a.m. shows internet search results for locations of "jewish owned stores" in Washington, D.C. *See generally*, Exhibit J (filed under seal), containing items from Miller's cellular phone. Miller's

devices did not include the Cleared for Entry group chats or the text messages from his wife submitted by the defendant as an exhibit to his objections to the Presentence Investigation Report.

Miller's phone also contained at least two typed out notes which make it clear that his beliefs in white supremacy influenced his decision to participate in the attack on the U.S. Capitol. The first note was created on November 9, 2020 and discusses Miller's belief that the 2020 presidential election was fraudulent. Miller blames the alleged election interference on "a cabal of media elites, corrupt officials, and big tech oligarchs" and claimed "[t]he nakedly transparent purpose of this historic swindle is clear: to perpetuate the mounting disenfranchisement and humiliation of America's White majority." *See* Exhibit K. Miller went on to criticize Former President Trump for not doing enough to protect "White Americans." Miller then made clear his intention to "fight" in order to protect "White America" saying:

> Only the National Justice Party has the will to break this corrupt cabal once and for all. We are mobilizing the toughest, most resilient and most politically savvy elements of White America in order to wage a real struggle for our country and for our birthright… The sham of this election is the wake up call to all decent White Americans to the existential peril we face, to the ruthless and malevolent nature of the system, and the need to put aside all fear and hesitation in the fight for our future.

Exhibit K.[5]

The second note recovered from his cell phone is dated April 27, 2021 – after January 6.

---

[5] According to the Anti-Defamation League, the National Justice Party ("NJP") was formed in August 2020 by a number of well-known white supremacists, most of whom attended the 2017 Unite the Right rally in Charlottesville, Virginia. The NJP is "virulently antisemetic" and blames Jews for multiple problems in the United States. It's party platform includes restrictions on Jews in the media, government and other institutions. *See* https://www.adl.org/resources/backgrounder /national-justice-party (last visited April 10, 2024).

*See* Exhibit L. That note appears to contain answers to some kind of questionnaire. The note further

expounds on Miller's white supremacist views, stating, "If one takes a deep enough look into who

has been driving the communist and capitalist empires of the 20th century they can see the dark

hands of Judaism being rubbed together behind closed doors while their puppets and pawns fight

each other in public to fight for their jewish masters." Miller goes on to state that the answer to

America's problems is "National Socialism" which "opposes the evil forces of Judaism so that the

best people of the world can flourish and be perfected."

### III.    THE CHARGES AND PLEA AGREEMENT

On December 21, 2022, a federal grand jury returned an indictment charging Miller with

nine counts, including:

1. Civil disorder, in violation of Title 18, United States Code, Section 231(a)(3);

2. Assaulting, resisting and impeding Officer L.M. using a dangerous weapon, in violation of Title 18, United States Code, Section 111(a)(1) and (b);

3. Assaulting, resisting and impeding officers using a dangerous weapon, in violation of Title 18, United States Code, Section 111(a)(1) and (b);

4. Theft of government property, in violation of Title 18, United States Code, Section 641;

5. Entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of Title 18, United States Code, Sections 1752(a)(1) and (b)(1)(A);

6. Disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of Title 18, United States Code, Sections 1752(a)(2) and (b)(1)(A);

7. Engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of Title 18, United States Code, Section 1752(a)(4) and (b)(1)(A);

8. Impeding passage through the Capitol grounds or buildings, in violation of Title 40, United States Code, Section 5104(e)(2)(E); and

9. Act of physical violence in the Capitol grounds or buildings, in violation of Title

40, United States Code, Section 5104(e)(2)(F).

On January 5, 2024, Miller was convicted of Count Two pursuant to a plea agreement. ECF No. 46.

## IV.    STATUTORY PENALTIES

Miller now faces sentencing on Count Two for assaulting Officer L.M. with a deadly or dangerous weapon. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Miller faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. ECF No. 46, ¶ 1; PSR at ¶ 4.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Guidelines calculation set out in the PSR. Namely, it agrees that the total offense level is 25, which when combined with a criminal history category of I, results in a Guidelines range of 57 to 71 months' imprisonment. PSR at ¶¶ 46-57; 124.

The Probation Office properly included a two-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(1) because the assault involved more than minimal planning. PSR at ¶ 47. Application Note 2 to U.S.S.G.§ 2A2.2 specifies that "'more than minimal planning' means more planning than is typical for commission of the offense in a simple form." Miller planned to travel to the Capitol for weeks before January 6 and his messages in the Cleared for Entry Chat advise other

Proud Boy recruits. Consistent with these discussions, Miller brought equipment with him, including ski goggles and thick gloves with plastic knuckles, which made it easier for him to engage in violence and counter any defenses, such as tear gas, used by the police. Miller also encouraged his fellow Proud Boys to dress "incognito" and take other measures to avoid detection, advice which Miller followed by wearing ski goggles and at times, covering his face with a gaiter. *See* U.S.S.G. § 2A2.2 Application Note 2 ("[W]earing a ski mask to prevent identification would constitute more than minimal planning"). Miller also followed the Proud Boys' directives not to wear Proud Boys colors that day, but to dress to blend in. For all these reasons, the two-level increase applies.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 60. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 25, Miller's Guidelines imprisonment range is 57 to 71 months.[6]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a sentence of 71 months of imprisonment.

### A.    The Pre-Planned and Violent Nature of the Offense Support a Sentence at the Top of the Guidelines Range.

Miller's participation in the riot – a riot that disrupted the peaceful transfer of power –was

---

[6] Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. However, section 4C1.1 does not apply in this case because Miller used violence as part of the offense of conviction.

particularly egregious, given his multiple and repeated violent attacks on police officers and his coordination and planning with other members of the Proud Boys.  However, his guidelines calculation accounts for only one instance of assault.   The Court should sentence him at the top of the range to reflect the violence of that one assault, and the other assaults which are otherwise not accounted for, many brutally carried out with makeshift weapons that struck officers, battling for their lives, including in the head and helmet.

What's more, Miller, unlike many other rioters, did not travel to Washington D.C. on January 6 to attend the rally but traveled directly to (and according to the plan agreed upon by his fellow Proud Boys) the U.S. Capitol. Unlike many rioters who stayed in the back, Miller arrived after the violence had erupted and advanced directly to the scene of the most violent and prolonged assaults on police that day – and personally contributed to that violence by attacking the police seven different times with dangerous weapons, and trying to clear out a window to enable rioters to get inside the building. All of this with the ultimate illegal purpose of interfering with this country's democratic process.

Miller's coordination with his fellow Proud Boys also makes his offense more serious.   As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Rhodes et al.*, 22-cr-15, 5/25/23 Sent. Tr. 111-12 (quoting *Callanan*, 364 U.S. at 593). Indeed, as Judge McFadden recently found with respect to a different Proud Boys

defendant on January 6, "the violence, the planning, and the extremist intentions of the group" make a defendant's association with the Proud Boys on January 6 an aggravating factor. *United States v. Speed,* 22-cr-244 (TNM), Dkt. 67 (May 8, 2023 Sent. Tr.) at 37. Miller's choice to invade Capitol Grounds with other Proud Boys intent on obstruction and violence made his conduct all the more dangerous and made his objective—obstructing the certification—all the more likely to succeed.   He was part of a group that planned for violence, immediately focused its attention on the Capitol that day, and took the lead participating in and encouraging violence, property destruction, and breaches. And Miller, of course, was not content to let others do his bidding that day: he personally assaulted officers over and over again.

The nature and circumstances of Miller's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

**B.      A Sentence at the Top of the Guidelines Range is Appropriate Given Miller's History and Characteristics, Including His Troubling Association with a Violent Extremist Organization and Prior Incident of Violence.**

Unlike many criminal defendants, Miller's family history and education provided him with ample opportunity to succeed and make lawful choices. He has a supportive family, a good education, and no significant health issues; his crimes were not crimes driven by poverty, neglect, or abuse.

Despite his advantages, Miller's employment history suggests a lack of personal responsibility. One employer commented that Miller was "a mediocre worker" who "complained a lot" but missed "quite a bit of time" (PSR ¶ 109). Another employer discharged Miller due to consistent lateness (PSR ¶110). Miller separated from another employer after having "issues" with

a colleague (PSR ¶ 112).

Miller's white supremacist views – namely his belief that the election was stolen to further prejudice "White America" – also clearly influenced his conduct on January 6. These viewpoints likely also contributed to his membership in the Proud Boys and his assumption of a leadership role in the extremist organization. And the items located in his home and on his devices at the time of his arrest, long after January 6, show Miller's continued alignment with the group, support for political violence, and a disregard for human suffering. *See generally* Exhibit J (filed under seal).

Additionally, January 6 was not the first time Miller used violence for political ends. In June 2019, Miller was arrested for disorderly conduct, disturbing the peace and assault at an event entitled "Drag Queen Story Time" at a library in Millersville, Maryland. PSR ¶ 65. According to news articles about the incident,[7] Miller attended the children's event and began shouting at the performer. When a library board member attempted to intervene, Miller shoved him and was arrested. While these charges were ultimately dropped, Miller's actions on this occasion serve as further proof that Miller is willing to use violence to enforce his personal beliefs.

Accordingly, the history and characteristics of the defendant counsel in favor of the recommended sentence.

---

[7]     *See*     https://www.cbsnews.com/baltimore/news/maryland-man-charged-in-drag-queen-storytime-scuffle/;     https://www.baltimoresun.com/2019/07/01/man-charged-with-assault-in-drag-queen-storytime-fight/

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence at the high end of the Guidelines range. Miller's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a sentence at the high end of the Guidelines range. First, although Miller has a criminal history category of I, his previous arrest, his association with the Proud Boys (which did not end on January 6) and the items located in his home suggest a willingness to use and celebrate violence.

While Miller has accepted responsibility for his actions by pleading guilty, there is no indication that Miller feels any remorse for his actions or even believes his actions on January 6

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

were wrongful. In fact, the items recovered from his phone in December 2020 show that after January 6, he believed his actions were righteous. *See* Exhibit J (filed under seal), Items 32, 33, 34, 35. It also appears that Miller removed evidence from his phone prior to his arrest, including chats with other Proud Boy members and text messages with his wife about his plans and whereabouts on January 6. Finally, as discussed above, Miller's troubling fixation with guns, violence and racism suggests he's at a higher risk of recidivism – namely the use of political violence – and a need for greater deterrence in this case.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United *States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

> *United States v. Ponder*, 21-CR-259 (TSC). Defendant Ponder assaulted police officers on the West Plaza by striking them with two different poles. From there, he went to the Upper West Terrace where he again confronted police trying to clear the area, again striking an officer with a pole. After being arrested and released, Ponder then made his way to the

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

tunnel where he joined the fight against the police. Unlike Miller, Ponder was not a member of any extremist groups, did not engage in pre-planning, and did not have a stable and comfortable upbringing. Ponder pleaded guilty to a violation of 18 U.S.C. §§ 111(a) and (b). This Court sentenced Ponder to a sentence of 63 months' imprisonment, at the top of his Guidelines range.

*United States v. Kenyon*, 21-CR-726 (CJN). Defendant Kenyon breached the U.S. Capitol building and remained inside for approximately 30 minutes. After leaving the building, he went to the tunnel where he threw several items at the police and used a table leg with a protruding nail to strike officers in the leg and head. Kenyon – unlike Miller – claimed to suffer from certain mental health diagnoses and was not a member of any extremist groups. Kenyon pleaded guilty to two violations of 18 U.S.C. §§ 111(a) and (b). Judge Nichols sentenced Kenyon to 72 months' imprisonment.

*United States v. Caldwell*, 21-CR-181 (CKK). Defendant Caldwell, like Miller, arrived at the Capitol prepared for a fight, outfitted with bear spray, protective eyewear, and a two-way radio. Caldwell confronted officers repeatedly on the West Plaza before spraying cans of bear mace at a police line. Caldwell then continued to advance up to the Upper West Terrace where he entered the U.S. Capitol through the Senate Wing Door. Caldwell pleaded guilty to a violation of 18 U.S.C. §§ 111(a) and (b). Judge Kollar-Kotelly sentenced Caldwell to 68 months' imprisonment.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officer L.M. did not suffer bodily injury as a result of Miller's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Miller must pay $2,000 in restitution, which reflects in part the role Miller played in the riot on January 6.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Miller's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 149.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Miller was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See*

*Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Miller to pay $2,000 in restitution for his conviction on Count Two. This amount fairly reflects Miller's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 71 months' imprisonment, three years of supervised release, restitution in the amount of $2,000 and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
IL Bar No. 6316768
601 D Street, N.W.

39

Washington, D.C. 20530
Kaitlin.klamann@usdoj.gov
(202) 252-6778